UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PHILIP DEBLASIO,

                          Plaintiff,

v.                                                    9:09-CV-1077
                                                      (TJM/GHL)

DAVID ROCK, et al.,

                          Defendants.
_____

APPEARANCES:                          OF COUNSEL:

PHILIP DEBLASIO, 09-A-6404
Plaintiff *pro se*
Five Points Correctional Facility
Caller Box 119
Romulus, NY 14541

HON. ERIC T. SCHNEIDERMAN            ADELE M. TAYLOR-SCOTT, ESQ.
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, NY 12224

THOMAS J. MCAVOY, Senior United States District Judge

## MEMORANDUM DECISION AND ORDER

In this *pro se* prisoner civil rights action, filed pursuant to 42 U.S.C. § 1983, Plaintiff

Philip DeBlasio alleges that twenty-three employees of the New York Department of Corrections

and Community Supervision ("DOCCS") violated his constitutional rights by denying him

adequate medical care, interfering with his right to exercise his religion, subjecting him to

excessive force, and subjecting him to unconstitutional conditions of confinement.  (Dkt. No. 1.)

Currently pending is Defendants' motion for summary judgment.  (Dkt. No. 55.)  Plaintiff has

not opposed the motion, despite having been advised of the consequences of failing to do so and having been granted four extensions of the deadline by which to do so.  (Dkt. No. 55 at 3; Jan. 19, 2011, Text Order; Feb. 16, 2011, Text Order; Mar. 31, 2011 Text Order; June 27, 2011, Text Order.)  For the reasons that follow, Defendants' motion for summary judgment is granted in part and denied in part.

## I.    BACKGROUND

Plaintiff, an inmate currently in DOCCS custody at Five Points Correctional Facility, complains in this action of a series of events that occurred at Great Meadow Correctional Facility in 2006 and 2009.  (Dkt. No. 1.)

### A.    Incidents in 2006

In his verified complaint, Plaintiff alleges that on December 28, 2006, Defendant Physician Assistant Fisher Nesmith stopped at his cell during sick-call rounds.  (Dkt. No. 1 at 11.)  Plaintiff told Defendant Nesmith that he needed to see the doctor for his chronic back pain and herniated discs.  *Id*.  Defendant Nesmith would not allow Plaintiff to see the doctor.  *Id*. at 12.  This happened "several times" again after December 28, 2006.  *Id*.

Plaintiff alleges that on December 28, 2006, Defendant Correction Officer Kevin Holden was assigned to pack Plaintiff's personal belongings because Plaintiff was moving to a new cell.  (Dkt. No. 1 at 12.)  Thereafter, pages were missing from each of Plaintiff's three copies of the Koran.  *Id*.  One of the three Korans had to be destroyed because it was missing so many pages.  *Id*. Plaintiff alleges that Defendant Holden is "defin[i]tely responsible" for the missing pages because he "was the only person to pack [P]laintiff's property . . ."  *Id*.

2

### B.     Incident with Extraction Team

Plaintiff alleges that one night in early August 2009[1], he complained of sharp pains in his left ribcage area and blood in his urine.[2]  (Dkt. No. 1 at 12.)  Defendant Correction Officer Kelsey Lenney told Plaintiff he would call a nurse.[3]  *Id*.  After speaking to Defendant Nurse Della Howley, Defendant Lenney returned twenty minutes later and asked Plaintiff if he had requested a sick call.  *Id*. at 12-13.  Plaintiff was enraged and started banging the gate and asking to see a sergeant.  *Id*. at 13.  When Defendant Sergeant John Busse responded to the scene, Plaintiff explained the situation and Defendant Busse said he would take care of it.  *Id*.  Two hours after Plaintiff had first complained of the pain, Defendant Howley arrived at his cell "with a very negative attitude."  *Id*.  Plaintiff "was so mad she wouldn't help him [that] he threw water at her and hit [Defendant] Lt. Richard Juckett as well."  *Id*.

After Plaintiff threw the water, an extraction team was mobilized to remove him from his cell.  (Dkt. No. 1 at 13.)  This team included Defendant Juckett, Defendant Busse, Defendant Correction Officer Adam Rivers, Defendant Lenney, Defendant Correction Officer Richard

---

[1]     Plaintiff's allegations about the precise dates on which the incidents in the complaint occurred are contradictory.  Early in the complaint, he alleges that he complained of the pain in his ribcage on "8-7-09."  (Dkt. No. 1 at 12.)  Later in the complaint, he says that "the next day" after the event was "9-7-09" and refers to it as "Friday morning of the same day." (Dkt. No. 1 at 14.)  September 7, 2009, was a Monday.  August 7, 2009, was a Friday.  These discrepancies need not be resolved because the precise dates are irrelevant to the issues in this case.

[2]     Defendant Lenney declares that Plaintiff complained to him of pain in his side but did not mention anything about blood in his urine.  (Dkt. No. 55-9 ¶¶ 4-5.)

[3]     Defendant Lenney declares that he did, indeed, call Defendant Howley about Plaintiff.  (Dkt. No. 55-9 ¶ 4.)  Defendant Howley declares that she does not recall having a conversation with "the Correction Officer on duty" but that she remembers receiving a telephone call from Defendant Juckett asking her to check on Plaintiff.  (Dkt. No. 56 ¶¶ 6-7.)

Dempster, and Defendant Correction Officer Richard Buell.  *Id*.

According to Plaintiff, Defendant Juckett told Plaintiff that "he was going to OBS[4] one way or the other" even if Defendant Juckett "had to drag [P]laintiff out of the cell himself."  *Id*. Plaintiff told Defendant Juckett that he was "not suicidal and should be sent to F-Block" as originally scheduled.  *Id*.  Defendant Juckett "was then just about to spray [P]laintiff in the face when [P]laintiff pleaded with him to take him out without gas[s]ing him . . ."  *Id*.  In the complaint, Plaintiff alleges that the extraction team moved him to an observation room and then beat him with sticks, their fists, and their feet.  *Id*.  At his deposition, Plaintiff testified that the members of the extraction team beat him with their fists for about a minute.  (Dkt. No. 55-16 at 84:17-24, 86:24-87:10.)

Defendants assert that they did not use any force on Plaintiff.  Defendant Dempster declares that the only physical contact that any member of the extraction team had with Plaintiff during the cell extraction was when Defendant Buell placed Plaintiff's wrists and legs in restraints.  (Dkt. No. 55-5 ¶ 10; Dkt. No. 55-8 ¶ 18.)  Defendant Dempster declares that Plaintiff "voluntarily complied with [a] strip frisk, which is standard procedure for inmates being processed into" the mental health unit.  (Dkt. No. 55-5 ¶ 12; Dkt. No. 55-8 ¶¶ 20-21.)  After that was done, the team "escorted [P]laintiff to an observation cell," which was "accomplished without incident."  (Dkt. No. 55-5 ¶¶ 13-14.)  Defendant Juckett declares that "[t]he only physical contact that I or any member of the extraction team had with Inmate DeBlasio that day was to place him in restraints, conduct a pat frisk, and be present when the inmate was subject to

_____

[4]     The Residential Crisis Treatment Program, often referred to as "OBS", is a special observation area for inmates who cannot be controlled by security officers or who become unmanageable, suicidal, or homicidal.  (Dkt. No. 55-2 ¶¶ 4-5.)

strip frisk."  (Dkt. No. 55-8 ¶ 25.)   Defendant Lenney declares that he "had no physical contact with inmate DeBlasio at all."  (Dkt. No. 55-9 ¶ 20.)  Defendant Rivers declares that he "had no physical contact with inmate DeBlasio during this engagement."  (Dkt. No. 55-11 ¶ 13.)

After Plaintiff was secured in the observation cell, the extraction team members left the area,  returned to their regular duties, and did not see Plaintiff again that day.  (Dkt. No. 55-5 ¶¶ 15-16; Dkt. No. 55-3 ¶¶ 13-14; Dkt. No. 55-8 ¶ 22; Dkt. No. 55-9 ¶ 21; Dkt. No. 55-1 ¶ 12.)  No paperwork was prepared documenting a use of force.  (Dkt. No. 55-11 ¶ 14.)  It is standard procedure to prepare a Use of Force Report when force is used on an inmate.  *Id*.

Plaintiff alleges that after the extraction team left, he remained in the observation cell all night without any medical attention or treatment.  (Dkt. No. 1 at 13.)  At his deposition he testified that he suffered only from "discomfort [and] bruises" as a result of the incident.  (Dkt. No. 55-16 at 83:6-8.)  About twenty-four hours after the incident, Plaintiff complained to an officer of chest pains.  (Dkt. No. 56 at 2 ¶ 15, 5.)  Plaintiff allowed Defendant Howley to examine him.  *Id*.  Plaintiff told Defendant Howley only that he had indigestion.  *Id*.  Defendant Howley found that Plaintiff had "no signs of distress."  *Id*.

### C.   Incident at Conference Room

The day after the incident with the extraction team, Defendant Correction Officer Scott Hamel escorted Plaintiff to a conference room to be interviewed by Defendant Dr. Battu[5] and Defendant Social Worker Sarah Wetherell.[6]  (Dkt. No. 1 at 14.)  Dr. Battu had been asked to see

---

[5]        The parties spell this defendant's name in a variety of ways.  In his declaration, he refers to himself as Kalyana Battu.  (Dkt. No. 55-2 at 1.) Therefore, I have used that spelling.

[6]        The parties spell this defendant's name in a variety of ways.  In her declaration, she refers to herself as Sarah Wetherell.  (Dkt. No. 55-20 at 1.) Therefore, I have used that

Plaintiff to "possibly prescribe medications to control his behavior or adjust medications that were already prescribed." (Dkt. No. 55-2 ¶ 9.) Dr. Battu often performs such interviews alone, but was accompanied by Defendant Wetherell "[b]ecause of the violent nature of this inmate." *Id*. ¶ 10. Defendant Wetherell had "worked with [P]laintiff for a number of years . . . and [was] familiar with his history and patterns of behavior." (Dkt. No. 55-20 ¶ 3.) Defendant Wetherell declares that the RCTP Coordinator was also present. (Dkt. No. 55-20 ¶ 13.)

Defendant Sergeant Crispin Murray declares that he supervised Defendant Hamel as he escorted Plaintiff to the appointment. (Dkt. No. 55-10 ¶ 5.) Once Plaintiff was in the conference room, Defendant Murray moved to a desk several feet away from the door to the room. (*Id*. ¶ 6; Dkt. No. 55-2 ¶ 11.)

Plaintiff alleges that he told Defendants Battu and Wetherell about the incident with the extraction team. (Dkt. No. 1 at 14.) He alleges that Defendant Battu said that it was none of his concern because he was just "there to handle medications and suicide prevention" and that because Plaintiff threw water at Defendant Howley he "may have deserved" what happened. *Id*. Plaintiff alleges that Defendant Wetherell "refused to comment or help [Plaintiff] in any way at all." *Id*. Plaintiff alleges that he called Defendant Wetherell "a snake sellout C.O. bitch" and she stormed out of the room and talked to Defendant Correction Officer Scott Hamel. *Id*. Dr. Battu declares that Plaintiff "became verbally abusive to Sarah Wetherell, nearly bringing her to tears, and when I tried to calm him down, [P]laintiff became abusive toward me." (Dkt. No. 55-2 ¶ 14.) Dr. Battu declares that Plaintiff's behavior "brought the interview to an end. The officer waiting outside moved in and escorted [P]laintiff out." (Dkt. No. 55-2 ¶ 15.) Defendant

---

spelling.

6

Wetherell declares that when "the session started to get hostile, the RCTP Coordinator stood up, and in doing so triggered a prearranged signal to security personnel to move in."  (Dkt. No. 55-20 ¶ 19.)

Plaintiff alleges that Defendant Hamel entered the conference room and rushed Plaintiff into a cell.  (Dkt. No. 1 at 14.)  Defendant Hamel declares that he entered the conference room because "I believe I observed [Plaintiff] stand up during the interview in disobedience of my direct order to him not to do so.  When the inmate stood up, I automatically moved in, took control of the restraints, and escorted him out of the room and back to his observation cell." (Dkt. No. 55-7 ¶ 9.)  Defendant Murray declares that when a "problem occurred in the interview room," he supervised Defendant Hamel as Defendant Hamel escorted Plaintiff back to his cell and Defendant Stemp joined them "to provide additional security coverage."  (Dkt. No. 55-10 ¶¶ 7-9.)

The parties dispute what happened next.  Defendant Hamel declares that before he placed Plaintiff in his cell, he asked him if he wanted to take a shower because inmates in the observation unit generally take showers on Mondays, Wednesdays, and Fridays.  (Dkt. No. 55-7 ¶ 10.)  Defendant Hamel declares that Plaintiff declined and then turned and head-butted him, hitting Defendant Hamel's forehead just over his left eye and splitting the skin open.  *Id.* ¶ 11. Defendants Murray and Stemp also declare that Plaintiff head-butted Defendant Hamel.  (Dkt. No. 55-10 ¶ 10; Dkt. No. 55-19 ¶ 6.)  Defendant Hamel declares that he "instinctively" pushed Plaintiff "forward and down to the floor with my left hand" and that Plaintiff banged his head on the way down.  (Dkt. No. 55-7 ¶ 12.)  Defendant Hamel declares that Plaintiff did not stay down and kept kicking and trying to bite Defendant Hamel.  *Id.* ¶ 13.  Defendant Murray declares that

he ordered Defendant Stemp to "go in and pull the inmate out of the cell so they could get control of him." (Dkt. No. 55-10 ¶ 13.) Defendant Hamel declares that he and Defendant Stemp "used the wrist restraints to lift [Plaintiff] out of the cell and onto the floor in the hallway." (Dkt. No. 55-7 ¶ 16.) Defendant Hamel declares that once Plaintiff was on the floor in the hallway, he took control of Plaintiff's legs while Defendant Stemp took control of Plaintiff's upper body. *Id*. ¶ 17. Defendant Stemp declares that he took control of Plaintiff's upper body by putting one knee on his back and the other on his head until he calmed down. (Dkt. No. 55-19 ¶ 10.) Defendant Hamel declares that Plaintiff calmed down and they all remained that way until Defendant Hamel and Defendant Stemp were relieved by other staff. (Dkt. No. 55-7 ¶ 18.)

Defendant Stemp declares that he "used only such force as was necessary to subdue the inmate. Nobody kicked, punched or otherwise asserted unnecessary force against" Plaintiff. (Dkt. No. 55-19 ¶ 13.) Defendant Murray declares that he "personally did not have any physical contact with the inmate." (Dkt. No. 55-10 ¶ 16.) Defendant Murray declares that given Plaintiff's "unprovoked assault on the escorting officer, his attempts to further assault the officer during the course of the take-down, and his refusal to comply with staff direction, I do not believe that . . . the actions of the men under my supervision violated any of [P]laintiff's federally protected rights." *Id*. ¶ 21.

Plaintiff's version of this incident is quite different. In his verified complaint, Plaintiff alleges that after Defendant Hamel escorted him to his cell, Defendants Stemp and Murray came into the cell. (Dkt. No. 1 at 14.) Plaintiff alleges that Defendant Murray removed Plaintiff's handcuffs, said "how tough are you now disrespecting Nurse Howley and Wetherell and Dr. Battu," and slapped Plaintiff on the left side of his face with an open hand. *Id*. All of the officers

8

then beat Plaintiff, got him onto his stomach, handcuffed him, and kicked him several more times in the face, head, and body. *Id*. at 14-15. At his deposition, Plaintiff testified that he did not do anything to any of the officers until Defendant Murray removed his handcuffs and punched him in the face. Plaintiff testified that it was only then that "I put my hands up and I started fighting with him." (Dkt. No. 55-16 at 99:12-100:17.)

When the relief officers arrived, Defendants Murray, Stemp, and Hamel escorted Plaintiff to the clinic to be examined for injuries. (Dkt. No. 55-10 ¶ 17.) Plaintiff and the officers were examined and photographed and Defendant Murray completed a Use of Force Report. (Dkt. No. 55-10 ¶ 18.) Medical records show that Plaintiff suffered bruises on his right shoulder, red cheeks, a quarter-sized bump on his scalp, two raised areas on the back of his scalp, and a bruised ear. (Dkt. No. 55-7 at 7.)

### D.    Conditions of Confinement

Plaintiff alleges that after this incident he was subjected to various harsh conditions of confinement. (Dkt. No. 1 at 15.)

#### 1.    Handcuff Incident with Defendant Segovis

Plaintiff alleges that on August 18, 2009, Defendant Correction Officer Roswell Segovis handcuffed Plaintiff to take him to the shower. (Dkt. No. 1 at 15.) Defendant Segovis noticed that Plaintiff was wearing socks and refused to let him shower. *Id*. He then left Plaintiff handcuffed in his cell for five hours. *Id*. Plaintiff pleaded with Defendant Segovis to remove the handcuffs so that he could use the bathroom. *Id*. Defendant Segovis refused and after several hours Plaintiff "had no choice but to wet his pants and then defecate on himself." *Id*. Defendant Segovis declares that he left Plaintiff handcuffed because Plaintiff "took the handcuffs hostage

and refused to put his hands through the feed-up slot so that they could be removed."  (Dkt. No. 55-18 ¶ 4.)

Later, Defendant Segovis issued a misbehavior report charging Plaintiff with committing an unhygienic act.  (Dkt. No. 1 at 15.)  The hearing officer sentenced Plaintiff to seven days of restricted diet.  *Id*.  Defendant First Deputy Superintendent Jeffrey Tedford "co-signed" the order for restricted diet.  *Id*.  The punishment "was brought to the attention" of Defendant Sergeant David Winchip, who "was going along with the entire [charade]."  *Id*.

### 2.   Hot Water

Plaintiff alleges that he was not able to get hot water because he was not given a bucket. (Dkt. No. 1 at 17.)  On August 19, 2009, Plaintiff asked Defendant Sergeant Peter DePalo for hot water.  (Dkt. No. 1 at 17.)  Defendant DePalo said "Muslims don't deserve hot water.  You'll get that when you get to hell."  *Id*.  On August 24, 2009, Plaintiff told a watch commander, in the presence of Defendant Winchip, that he was not receiving hot water.  *Id*. at 18.  Defendant Winchip said he would see to it that Plaintiff got a bucket for hot water.  *Id*.  Later that day, Defendant Winchip came to Plaintiff's cell and said "You won't get that bucket[] today you dirty white Muslim wigger."  *Id*.

### 3.   Drinking Water

Plaintiff alleges that he once went without water for a week.  (Dkt. No. 1 at 15.)  He alleges that during the week that he went without water, Defendant Correction Officer William Powers was responsible for turning on Plaintiff's water and failed to do so.  (Dkt. No. 1 at 6.)  At his deposition, Plaintiff testified that Defendant Segovis was also responsible.  (Dkt. No. 55-16 at 150: 2-5, 6-9.)

10

4.      Food

Plaintiff alleges that on August 18, 2009, Defendant Correction Officer Alan White and Defendant Segovis played with Plaintiff's breakfast tray and Plaintiff had to plead with them in order to get it.  (Dkt. No. 1 at 16.)  At lunch[7] Defendant White gave Plaintiff only a quarter cup of juice to drink and no lunch tray.  *Id.*  Later, Defendant DePalo came to Plaintiff's cell asking for the empty lunch tray.  *Id.*  Plaintiff told him that he was never given a lunch tray.  *Id.*  Defendant DePalo looked under Plaintiff's bed and did not see a tray.  *Id.*  That night at dinner an officer served Plaintiff a special diet loaf instead of regular food and told him that he would receive it for seven days as punishment for not giving back his lunch tray.  *Id.*  This punishment was ordered by Defendants White and Segovis and "co-signed" by Defendant DePalo.  *Id.* at 17.  Plaintiff asserts that Defendants White and Segovis "have a history" with him and "blatantly harass[ed]" Plaintiff "to disturb his Fast of Ramadan."  *Id.* at 16-17.

Plaintiff alleges that on one occasion,  Defendant Segovis gave Plaintiff pork instead of the special diet loaf.  *Id.*  Defendant Segovis said "You know you want to eat some swine."  *Id.* at 18.

5.      Recreation and Movement

Plaintiff alleges that he was not allowed to move outside his cell at all when Defendant Segovis was assigned to his block.  (Dkt. No. 1 at 17.)

6.      Showers

Plaintiff alleges that on one occasion, Defendant Segovis would not allow Plaintiff to

---

[7]      It is unclear when Plaintiff went to lunch on August 18, 2009, because, as discussed above, he alleges that he was handcuffed in his cell from 8:00 a.m. to 1:00 p.m. (Dkt. No. 1 at 15.)

shower. *Id*. When Plaintiff reported this to Defendant DePalo, he said "That's life in F-block for Muslims." *Id.*

       7.    <u>Bibles</u>

Plaintiff alleges that on August 31, 2009, a chaplain came to Plaintiff's cell to deliver two Bibles. (Dkt. No. 1 at 16.) Defendants Powers and Segovis told the chaplain to leave the Bibles and that they would give them to Plaintiff when they were not busy. *Id.* Defendant Powers came to Plaintiff's cell and "said [he] was banging all day." *Id.* Plaintiff said it was not him who was banging. *Id.* Defendant Powers said he would investigate and that Plaintiff would not be getting his Bibles. *Id.* On or about September 8, 2009, Defendant Powers came to Plaintiff's cell, told him he had discovered that it was not Plaintiff who was banging, and apologized. *Id.* However, he did not give Plaintiff his Bibles. *Id.* The record shows that Plaintiff received the Bibles on September 12, 2009.[8] (Dkt. No. 55-6 at 28.)

**E.    Restrictions on Religious Practice**

Plaintiff claims that Defendant Superintendent David Rock and Defendant CORC Director Karen Bellamy violated his religious rights in three ways. (Dkt. No. 1 at 18.) First, he alleges that he was not allowed to demonstratively pray in the BHU recreation pen. *Id.* Plaintiff alleges that Defendant Rock allows Christians to pray but "is obviously discriminating against the Muslims" by prohibiting demonstrative prayer. *Id.* at 18-19. Second, he alleges that BHU and SHU inmates are not allowed to have razors, which prevents Muslims from shaving their

---

[8]     Plaintiff signed the complaint in this action on September 10, 2009. (Dkt. No. 1.) Thus, he had not received the Bibles when he wrote the complaint. Because Plaintiff has not opposed the motion for summary judgment, it is unclear whether he wishes to continue asserting the claim regarding the Bibles.

pubic and armpit hair as required by their faith.  *Id*. at 19.  Third, Plaintiff alleges that he is not

given Halal food.  *Id*.

### F.  Procedural History

Plaintiff filed his complaint in this Court on September 23, 2009.  (Dkt. No. 1.)

Plaintiff's complaint sets forth three causes of action: (1) religious discrimination; (2) "assault

and cruel and unusual punishment at the hands of DOCS workers"; and (3) a request that

Plaintiff receive "proper medical attention at all times."  (Dkt. No. 1 at 20.)  Plaintiff requests

injunctive relief (being allowed to pray in the recreation pen, being allowed to shave his pubic

hair, and given Halal food) and damages.  *Id*. at 21.

Defendants now move for summary judgment.  (Dkt. No. 55.)  Plaintiff has not opposed

the motion.

## II.  APPLICABLE LEGAL STANDARDS

### A.  Legal Standard Governing Unopposed Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the

movant shows that there is no genuine issue as to any material fact and that the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment

bears the initial burden of showing, through the production of admissible evidence, that no

genuine issue of material fact exists.  Only after the moving party has met this burden is the

nonmoving party required to produce evidence demonstrating that genuine issues of material fact

exist.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  The nonmoving party must do

more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that

there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 585-86 (1986).  Rather, a dispute regarding a material fact is *genuine*

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine

issue of material[9] fact exists, the Court must resolve all ambiguities and draw all reasonable

inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino*, 542 F.3d

290, 309 (2d Cir. 2008).

When a plaintiff fails to respond to a defendant's motion for summary judgment, "[t]he

fact that there has been no [such] response . . . does not . . . mean that the motion is to be granted

automatically."  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, the Court must (1)

determine whether any facts are disputed in the record presented on the defendants' motion, and

(2) determine whether, based on the *undisputed* material facts, the law indeed warrants judgment

for the defendants.  *See Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp.,*

*Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001); N.D.N.Y. L.R. 7.1(b)(3).

### B.    Legal Standard Governing Motions to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of

Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion

is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of

Civil Procedure 12(b)(6).  As a result, "[w]here appropriate, a trial judge may dismiss for failure

to state a cause of action upon motion for summary judgment."  *Schwartz v. Compagnise Gen.*

*Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968) (citations omitted); *accord*, *Katz v. Molic*, 128

---

[9]        A fact is "material" only if it would have some effect on the outcome of the suit.
*Anderson*, 477 U.S. at 248.

F.R.D. 35, 37-38 (S.D.N.Y. 1989) ("This Court finds that . . . a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").  Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted.  In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added).  "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not shown -- that the pleader is entitled to relief."  *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted).  Courts are "obligated to construe a *pro se* complaint liberally."  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements

15

of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949.

## III.   ANALYSIS

### A.   Failure to Exhaust Administrative Remedies Regarding Claims Against Defendants Nesmith and Holden

Plaintiff alleges that Defendant Nesmith would not allow Plaintiff to see a doctor for back pain and that Defendant Holden ripped pages from Plaintiff's Korans.  (Dkt. No. 1 at 11-12.) Defendants argue that these claims should be dismissed because Plaintiff failed to exhaust his administrative remedies.  (Dkt. No. 55-23 at 13-14.)  Defendants are correct.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined.  *Jones v. Bock*, 549 U.S. 199, 218 (2007).  In New York state prisons, the Department of Corrections and Community Supervision ("DOCCS") has a well-established three-step inmate grievance program.  N.Y. Comp. Codes R. & Regs. tit. 7, § 701.7 (2010).

Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following

procedure for the filing of grievances.  First, an inmate must file a complaint with the facility's

IGP clerk within twenty-one calendar days of the alleged occurrence.  N.Y. Comp. Codes R. &

Regs. tit. 7, § 701.5(a) (2010).  A representative of the facility's inmate grievance resolution

committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally

resolve the issue.  *Id.* at (b)(1).  If there is no such informal resolution, then the full IGRC

conducts a hearing within sixteen calendar days of receipt of the grievance, and issues a written

decision within two working days of the conclusion of the hearing.  *Id.* at (b)(2).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within

seven calendar days of receipt of the IGRC's written decision.  If the grievance involves an

institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a

written decision within twenty calendar days of receipt of the grievant's appeal.  Grievances

regarding DOCCS-wide policy issues are forwarded directly to the central office review

committee ("CORC") for a decision under the process applicable to the  third step.  *Id.* at (c).

Third, a grievant may appeal to CORC within seven working days of receipt of the

superintendent's written decision.  CORC is to render a written decision within thirty calendar

days of receipt of the appeal.  *Id*.  at (d).

If a prisoner has failed to properly follow each of the applicable steps prior to

commencing litigation, he has failed to exhaust his administrative remedies.  *Woodford v. Ngo*,

548 U.S. 81 (2006).

Here, Jeffrey Hale, the Assistant Director of the Inmate Grievance Program for DOCCS,

declares that there "are no CORC appeal records that correspond to the December 28, 2006,

events as alleged in [P]laintiff's complaint regarding back pain or the loss of personal or religious

17

property at the Great Meadow Correctional Facility."  (Dkt. No. 55-6 ¶ 7.)  CORC records show

that Plaintiff did not file any CORC appeals between October 2006 and October 2008.  (Dkt. No.

55-6 at 5.)  Indeed, Plaintiff admitted at his deposition that he did not properly exhaust his

administrative remedies regarding Defendant Holden's alleged desecration of the Korans.[10]  (Dkt.

No. 55-16 at 57:17-58:5.)  Therefore, Plaintiff failed to exhaust his administrative remedies

regarding his claims against Defendants Nesmith and Holden.

Plaintiff's failure to exhaust, however, does not end the inquiry.  The Second Circuit has

held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available

administrative remedies.  *Hemphill v. New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004).[11]  First,

"the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in

fact 'available' to the prisoner."  *Hemphill*, 380 F.3d at 686 (citation omitted).   Second, if those

remedies were available, "the court should . . . inquire as to whether [some or all of] the

defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or

preserve it . . . or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of

remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust

as a defense."  *Id.* (citations omitted).   Third, if the remedies were available and some of the

defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the

court should consider whether 'special circumstances' have been plausibly alleged that justify the

---

[10]      Plaintiff was not able to recall any of the details about the incident with Defendant Nesmith.  (Dkt. No. 55-16 at 37-41.)

[11]      The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford*, 548 U.S. 81.  *Chavis v. Goord*, No. 07-4787-pr, 2009 U.S. App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

Here, as discussed above, an administrative remedy was available to Plaintiff. Defendants preserved the exhaustion defense by asserting it in their answer to the complaint. (Dkt. No. 39 ¶ 18.)  The record before the Court on this unopposed motion for summary judgment indicates neither that Defendants should be estopped from asserting the defense nor any special circumstances justifying Plaintiff's failure to exhaust his administrative remedies. Therefore, the Court grants Defendants' motion for summary judgment dismissing the claims against Defendants Nesmith and Holden.

## B.    Claims Regarding Failure to Provide Medical Care

Plaintiff alleges that Defendants Buell, Busse, Dempster, Howley, Juckett, Lenney, and Rivers [12] failed to provide him with adequate medical care.  (Dkt. No. 1at 11-14.)  Defendants argue that there are "neither objective nor subjective facts to support Plaintiff's conclusory medical indifference claim." (Dkt. No. 55-23 at 14-17.)  Defendants are correct.

### 1.    Defendants Lenney, Busse, and Howley

Plaintiff alleges that Defendants Lenney, Busse, and Howley failed to adequately respond to his complaints of ribcage pain and blood in his urine.  (Dkt. No. 1 at 12-13.)

There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581

---

[12]      Defendants characterize the complaint as asserting Eighth Amendment medical care claims against only Defendants Nesmith, Howley, and Battu.  (Dkt. No. 55-23 at 14.)

F.3d 63, 72 (2d Cir. 2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).

The undisputed facts show that Plaintiff did not suffer from a serious medical condition. A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) (citations omitted), *accord*, *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1996); *cert. denied*, 513 U.S. 1154 (1995); *Chance v. Armstrong*, 143 F.3d 698*,* 702 (2d Cir. 1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance*, 143 F.3d at 702-03. Here, Plaintiff alleges that he complained to Defendants Lenney, Busse, and Howley of "sharp pains in his left ribcage area and the pissing of blood." (Dkt. No. 1 at 12.) Defendant Lenney declares that Plaintiff complained to him of pain in his side but did not mention anything about blood in his urine. (Dkt. No. 55-9 ¶¶ 4-5.) When Plaintiff allowed Defendant Howley to examine him the next day, he stated only that he had indigestion. (Dkt. No. 56 at 5.) There is no evidence that Plaintiff's ribcage pain and the blood he reported in his urine significantly affected his daily activities or caused him chronic and substantial pain. The record before the Court, therefore, does not reflect that Plaintiff suffered from "a condition of urgency, one that may produce death, degeneration, or extreme

pain."

Even if Plaintiff had raised a triable issue as to the objective prong of his Eighth Amendment medical care claim against Defendants Lenney, Busse, and Howley, the Court would grant summary judgment on this claim because Plaintiff has not raised a triable issue of fact that any of these Defendants were deliberately indifferent to his medical needs.  Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance*, 143 F.3d, 698, 703 (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)).

Defendants Lenney and Busse are correction officers, not medical staff members.  (Dkt. No. 1 at 8; Dkt. No. 55-9 ¶ 1.)  "Non-medical personnel engage in deliberate indifference where they intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to attendant prison personnel." *Baumann v. Walsh*, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999).  Here, as discussed above, there is no evidence that Plaintiff was in "extreme pain."  Moreover, the undisputed facts show that neither Defendant Lenney nor Defendant Busse intentionally delayed Plaintiff's access to medical care.  Defendant Lenney declares that he called Defendant Howley regarding Plaintiff's complaints of pain.  (Dkt. No. 55-9 ¶ 4.)  By Plaintiff's own admission, Defendant Howley came to his cell two hours after he first complained of pain.  (Dkt. No. 1 at 13.)  A two-hour wait for medical care is not the type of delay that indicates deliberate indifference.  *See Baumann*, 36 F. Supp. 2d at 512 (denying defendants' motion to dismiss where plaintiff alleged that correction officer delayed care for his injured arm for three weeks).  Therefore, the Court grants Defendants' motion for summary judgment and

dismisses the Eighth Amendment medical care claims against Defendants Lenney and Busse.

Regarding Defendant Howley, to establish deliberate indifference on the part of medical staff, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. 825, 835; *Ross v. Giambruno*, 112 F.3d 505 (2d Cir. 1997). The undisputed facts show that Defendant Howley came to Plaintiff's cell to tend to his pain but that Plaintiff threw toilet water on her before she could examine him. (Dkt. No. 1 at 13; Dkt. No. 56 ¶ 11.) Thus, the undisputed facts show that the failure to provide immediate care to Plaintiff was the result of his own conduct rather than any conscious and intentional disregard on the part of Defendant Howley. Therefore, the Court grants Defendants' motion for summary judgment and dismisses the Eighth Amendment medical care claim against Defendant Howley.

### 2.      Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers

Plaintiff alleges that the members of the extraction team (Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers) violated his Eighth Amendment rights by leaving him in a cell all night without any medical attention or treatment. (Dkt. No. 1 at 13).

The undisputed facts show that Plaintiff did not suffer from any serious medical condition as a result of the incident with the extraction team. Plaintiff testified that he suffered from "discomfort [and] bruises" from the incident. (Dkt. No. 55-16 at 83:6-8.) Superficial injuries such as bruises are not "serious medical conditions." *Tafari v. McCarthy*, 714 F. Supp. 2d 317,

354 (N.D.N.Y. 2010).  Therefore, the Court grants Defendants' motion for summary judgment

and dismisses the Eighth Amendment medical care claims against Defendants Buell, Busse,

Dempster, Juckett, Lenney, and Rivers.

### C.    Excessive Force Claim Against the Extraction Team

Plaintiff claims that the members of the extraction team (Defendants Buell, Busse,

Dempster, Juckett, Lenney, and Rivers) used excessive force.  (Dkt. No. 1 at 13.)  Defendants do

not explicitly address Plaintiff's Eighth Amendment excessive force claim regarding the

extraction team, although their memorandum of law requests "that [P]laintiff's complaint be

dismissed, *in its entirety*, and without leave to replead" and states, in the section regarding

medical care, that "the extraction team did not use any force against [P]laintiff."  (Dkt. No. 55-23

at 16 and 30, emphasis added.)  The Court finds that Plaintiff has, just barely, raised a triable

issue of material fact on this issue.

When prison officials are "accused of using excessive physical force in violation of the

Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was

applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to

cause harm."  *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).  The extent of any injury suffered by

the inmate "is one factor that may suggest whether the use of force could plausibly have been

thought necessary in a particular situation or instead evinced such wantonness with respect to the

unjustified infliction of harm as is tantamount to a knowing willingness that it occur."  *Id.* at 7

(citation and quotation marks omitted).

> In determining whether the use of force was wanton and unnecessary,
> it may also be proper to evaluate the need for application of force, the
> relationship between that need and the amount of force used, the

> threat reasonably perceived by responsible officials, and any efforts
> made to temper the severity of a forceful response.  The absence of
> serious injury is therefore relevant to the Eighth Amendment inquiry,
> but does not end it.

*Id.* (citation and quotation marks omitted).  In other words, not "every malevolent touch by a

prison guard gives rise to a federal cause of action.  The Eighth Amendment's prohibition of

cruel and usual punishments necessarily excludes from constitutional recognition *de minimis*

uses of physical force, provided that the use of force is not of a sort repugnant to the conscience

of mankind."  *Id.* at 9.

Here, Plaintiff's verified complaint alleges that the members of the extraction team beat

Plaintiff with sticks, their fists, and their feet.  (Dkt. No. 1 at 13.)  At his deposition, Plaintiff

testified that the members of the extraction team beat him with their fists for about a minute.

(Dkt. No. 55-16 at 84:17-24, 86:24-87:10.)  If Plaintiff's version of events is credited,

Defendants' use of force was more than *de minimis* despite the fact that Plaintiff suffered only

bruises and discomfort as a result.  *Cf. Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 471

(S.D.N.Y. 1998) ( kicking an inmate's ankles and feet during a pat frisk is *de minimis* and

insufficient to rise to the level of a constitutional violation); *Show v. Patterson*, 955 F. Supp. 182,

192-93 (S.D.N.Y. 1997) (pushing inmate against wall with hands and no use of weapons *de

minimis* use of force); *Anderson v. Sullivan*, 702 F. Supp. 424, 425-27 (S.D.N.Y. 1988) (pushing

inmate's face into a bar while applying handcuffs not significantly disproportional to the goal of

handcuffing plaintiff).

Defendants flatly contradict Plaintiff's version of events.  The members of the extraction

team declare that the only physical contact any of them had with Plaintiff was to place him in

restraints, pat frisk him, and strip frisk him.  (Dkt. No. 55-8 ¶ 25; Dkt. No. 55-9 ¶ 20; Dkt. No.

55-11 ¶ 13.)

Given these conflicting versions of events, the Court is called upon to weigh the parties'

credibility.  In general, of course, "[c]redibility determinations . . . are jury functions, not those of

a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  *See also Rule v. Brine,*

*Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between

conflicting versions of the events are matters for the jury, not for the court on summary

judgment.").  There is, however,  a "narrow exception" to the general rule that credibility

determinations are not to be made on summary judgment.  *Jeffreys v. City of New York*, 426 F.3d

549, 554 (2d Cir. 2005); *Blake v. Race*, 487 F. Supp. 2d 187, 202 (E.D.N.Y. 2007).  Under this

exception, in the "rare circumstance where the plaintiff relies almost exclusively on his own

testimony, much of which is contradictory and incomplete" and the plaintiff's evidence is

contradicted by evidence produced by the defendants, the court may appropriately conclude at the

summary judgment stage that no reasonable jury would credit the plaintiff's testimony.  *Jeffreys*,

426 F.3d at 554.

Here, although Plaintiff is relying exclusively on his own testimony and his evidence is

contradicted by evidence produced by Defendants, the *Jeffreys* exception does not apply because

Plaintiff's testimony is not "contradictory and incomplete."  The complaint and deposition

testimony are moderately contradictory.  In the complaint, Plaintiff alleges that the extraction

team members beat him with sticks, their fists, and their feet.  (Dkt. No. 1 at 13.)  However, at

his deposition, Plaintiff testified that the team members hit him only with their fists.  (Dkt. No.

56-16 at 84:17-19.)  However, this is far less contradictory than the plaintiff's statements in

*Jeffreys*.  There, the plaintiff, who alleged that a group of police officers beat him and threw him out a third-floor window, confessed on at least three occasions that he had jumped rather than having been thrown.  *Jeffreys*, 426 F.3d at 552.  The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident.  *Id*.  The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question.  *Id.*  Plaintiff's deposition and complaint are also far less contradictory than cases in which courts have applied *Jeffreys* to make credibility determinations at the summary judgment stage.  *See Butler v. Gonzalez,* No. 09 Civ. 1916, 2010 U.S. Dist. LEXIS 108244, at *24-26, 2010 WL 3398156, at *8 (S.D.N.Y. May 18, 2010) (collecting cases).[13]  Therefore, although this is a very close question, the Court finds that Plaintiff has raised a triable issue of fact that Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers used excessive force against him.  Accordingly, the Court denies Defendants' motion for summary judgment dismissing this claim.

### D.    Claims Against Defendants Battu and Wetherell

Plaintiff alleges that he reported the incident with the extraction team to Defendants Battu and Wetherell, that they refused to get involved, and that Defendant Battu told him that he may have deserved the way he was treated.  (Dkt. No. 1 at 14.)  Defendants move to dismiss these claims, arguing that Plaintiff has failed to allege that Defendants Battu and Wetherell were

---

[13]    The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

personally involved in any constitutional violation.  (Dkt. No. 55-23 at 11-12.)  Plaintiff's allegations against Defendant Battu and Wetherell are properly analyzed as a failure-to-intervene claim.  On that claim, summary judgment in favor of Defendants is appropriate.

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights.  *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citation omitted).  A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene."  *Id.* (citation omitted).  Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide.  *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a reasonable jury could not conclude that Defendants Battu and Wetherell failed to intervene with an ongoing constitutional violation.  The undisputed facts show that Plaintiff did not tell Defendants Battu and Wetherell about the incident with the extraction team until several hours after it was over.  (Dkt. No. 1 at 13-14.)   Even if one fully credits Plaintiff's version of events, Defendants Battu and Wetherell did not have any realistic opportunity to intervene and prevent the harm.  Therefore, Defendants' motion for summary judgment dismissing the claims against Defendants Battu and Wetherell is granted.

### E.     Excessive Force Claim Against Defendants Hamel, Murray, and Stemp

Plaintiff contends that Defendants Hamel, Murray, and Stemp subjected him to excessive force as directed by Defendants Battu and Wetherell.  (Dkt. No. 1 at 14-15; Dkt. No. 55-16 at 93:14-95:3.)  Defendants' memorandum of law does not address this excessive force claim.

As discussed above in Section I(C), the parties dispute what happened when Plaintiff was removed from the conference room.  Plaintiff alleges that Defendants Hamel, Murray, and Stemp beat him and then kicked him while he was handcuffed.  (Dkt. No. 1 at 14-15.)  Defendants contend that Plaintiff head-butted Defendant Hamel without provocation and that they used only enough force to bring him under control.  (Dkt. No. 55-7 ¶ 11; Dkt. No. 55-10 ¶ 10; Dkt. No. 55-19 ¶ 6.)  Medical records show that Plaintiff suffered bruises on his right shoulder, red cheeks, a quarter-sized bump on his scalp, two raised areas on the back of his scalp, and a bruised ear. (Dkt. No. 55-7 at 7.)

Given the parties' conflicting versions of events and Defendants' failure to address the claim, the Court finds that the excessive force claim against Hamel, Murray, and Stemp survives summary judgment.

However, there is no competent evidence that Defendants Battu and Wetherell were involved in the incident.  Although Plaintiff claims that they ordered the use of force, he does not have any personal knowledge to support that opinion.  To be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge."  Fed. R. Civ. P. 56(e) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.").  "Statements

28

that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Oil*, 196 F.3d 435, 452 (2d Cir. 1999) (citations omitted). Therefore, the claim that Defendants Battu and Wetherell ordered Defendants Hamel, Murray, and Stemp to beat Plaintiff is dismissed.

### F.    Conditions of Confinement Claims

Plaintiff alleges that Defendants DePalo, Powers, Segovis, Tedford[14], White, and Winchip subjected him to cruel and unusual punishment by subjecting him to harsh conditions of confinement.[15]  (Dkt. No. 1 at 15-18.)  Defendants argue that Plaintiff has "failed to allege a plausible Eighth Amendment claim" regarding the conditions of his confinement.  (Dkt. No. 55-23 at 17-20.)

1.    Handcuff Incident with Defendant Segovis

Plaintiff alleges that Defendant Segovis violated his Eighth Amendment rights by leaving Plaintiff handcuffed in his cell for five hours while Plaintiff pleaded to be un-handcuffed so he could use the bathroom.  (Dkt. No. 1 at 15.)  Defendants argue that this claim should be dismissed because there is "neither an objective nor a subjective basis for assigning Eighth Amendment liability.  Leaving [P]laintiff in the cell handcuffed behind his back for several hours was a much safer alternative than having to perform a cell extraction to retrieve [the handcuffs]." (Dkt. No. 55-23 at 19.)  Defendants are not entitled to summary judgment on this claim because Plaintiff's verified complaint raises a triable issue of fact that Defendant Segovis subjected him

---

[14]    Defendants do not address the claim against Defendant Tedford.

[15]    Plaintiff does not assert that Defendants subjected him to these conditions of confinement in retaliation for any protected conduct.  (Dkt. No. 1 at 20.)  Therefore, I will address the conditions of confinement claims solely under Eighth Amendment standards.

to unconstitutional conditions of confinement.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle*, 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

To satisfy the objective component of an Eighth Amendment conditions of confinement claim, "the deprivation alleged must be, objectively, 'sufficiently serious.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

To satisfy the subjective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant acted with "deliberate indifference." *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). A prison official demonstrates deliberate indifference to

30

inhumane conditions of confinement where he "knows of and disregards an excessive risk to

inmate health or safety; the official must both be aware of facts from which the inference could

be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Farmer*, 511 U.S. at 837.

Defendants' extremely spare argument regarding Plaintiff's claim against Defendant

Segovis states, in full:

> Plaintiff alleges that on August 18, 2009, he presented himself for
> shower in socks and was left locked in the cell with handcuffs on for
> several hours by Defendant Segovis. The only reason security staff
> would leave an inmate handcuff[ed] in their cell is if they
> "kidnapped" the cuffs, and [P]laintiff refused to put his hand and
> wrists through the modified feed-up slot to allow the officer Segovis
> to remove the cuffs. Once again, [P]laintiff's refusal to comply with
> staff direction and facility procedures resulted in a reasonable and
> foreseeable deprivation. These facts, moreover, provide neither an
> objective nor a subjective basis for assigning Eighth Amendment
> liability. Leaving [P]laintiff in the cell handcuffed behind his back
> for several hours was a much safer alternative than having to
> perform[] a cell extraction to retrieve them, for both [P]laintiff and
> staff. Plaintiff was not subjected to a serious risk of harm, and the
> circumstance was not the result of deliberate indifference to inmate
> health or safety such as to give rise to an Eighth Amendment cause of
> action. *Gaston v. Coughlin,* 249 F2d at 16.

(Dkt. No. 55-23 at 19, citations to record omitted.)  Defendants do not address Plaintiff's

allegation that he pleaded with Defendant Segovis to release him from his handcuffs so that he

could use the bathroom or his allegation that he ultimately urinated and defecated on himself.

Defendants cite only *Gaston v. Coughlin*, 249 F.3d 156 (2d Cir.2001)[16] to support their

argument.  In that case, the Second Circuit held that a  triable issue of fact existed on a conditions

---

[16]     As noted in the block citation, Defendants cite this case as "249 F.2d at 16."  (Dkt.
No. 55-23 at 19.)

of confinement claim where the prisoner alleged that, *inter alia*, the area directly in front of his cell was filled with human feces, urine, and sewage water for several days.  Although it is not entirely clear, Defendants may be arguing that Plaintiff's claim should be dismissed because his allegations are not as dire as those asserted by the plaintiff in *Gaston*.  However, a reasonable juror, if he or she credited Plaintiff's version of events, could find that being handcuffed for five hours while pleading to be released in order to use the bathroom is an extreme deprivation.  Similarly, a reasonable juror who credited Plaintiff's version of events could find that Defendant Segovis was deliberately indifferent.  Therefore, Defendants' motion for summary judgment dismissing the claim against Defendant Segovis regarding the handcuffing incident is denied.

      2.     <u>Hot Water</u>

Plaintiff alleges that he was denied hot water on several occasions.  (Dkt. No. 1 at 17.) Defendants move for summary judgment, arguing that the claim should be dismissed.  (Dkt. No. 55-23 at 20.)  Defendants are correct.  The denial of hot water in an inmate's cell fails to state an Eighth Amendment claim because it does "not constitute [a] serious deprivation[] of basic human needs."  *Graham v. Perez*, 121 F. Supp. 2d 317, 323 (S.D.N.Y. 2000).  Therefore, Defendants' motion for summary judgment dismissing Plaintiff's claim that Defendants violated his Eighth Amendment rights by failing to provide him with a bucket for hot water is granted.

      3.     <u>Drinking Water</u>

Plaintiff's complaint alleges that he was denied drinking water in his cell for a week. (Dkt. No. 1 at 15.)  In his complaint and at his deposition, Plaintiff alleged that Defendant Powers was responsible for this deprivation because he failed to turn Plaintiff's water on.  (Dkt. No. 1 at 16; Dkt. No. 55-16 at 152:18-19.)  At his deposition, Plaintiff testified that Defendant

Segovis was also responsible. (Dkt. No. 55-16 at 150:3-5, 9-12.) Defendants' memorandum of law does not discuss this claim.

Where a prisoner alleges that he or she was denied drinking water in his or her cell, the resolution of the claim hinges on whether the prisoner received fluids at other times or suffered any adverse effects. *Compare Johnson v. Comm'r of Corr. Servs.,*669 F. Supp. 1071, 1074 (S.D.N.Y. 1988) (prisoner confined for one week in a cell with an inoperable sink did not suffer a constitutional violation because he was provided drinks with meals) *with Atkins v. County of Orange*, 372 F. Supp. 2d 377, 406 (S.D.N.Y. 2005) (inmate raised triable issue of fact that the defendants subjected her to unconstitutional conditions of confinement by depriving her of water in her cell for almost one month despite fact that they provided her with fluids at meals where medical records showed inmate suffered adverse effects from water deprivation). Here, Plaintiff received juice at meals. (Dkt. No. 55-16 at 152:9-13.) There is no evidence that Plaintiff suffered any adverse effects from water deprivation. Therefore, the Court *sua sponte* dismisses Plaintiff's claims regarding the deprivation of drinking water.

    4.    <u>Food</u>

Plaintiff alleges that Defendants interfered with his food on several occasions. Specifically, he alleges that (1) Defendants White and Segovis forced Plaintiff to plead with them before they gave him his breakfast tray on August 18, 2009 (Dkt. No. 1 at 16); (2) Defendant White gave Plaintiff only juice for lunch one day (Dkt. No. 1 at 16); Defendants White, Segovis, DePalo, and Tedford punished him by restricting him to a special loaf diet (Dkt. No. 1 at 15, 16-17); and (4) Defendant Segovis gave him pork instead of his special diet on one occasion (Dkt. No. 1 at 18). Defendants move for summary judgment dismissing these claims, arguing that

"such deprivations are *de minimis* and do not rise to a level of constitutional significance . . ."
(Dkt. No. 55-23 at 18.)  Defendants are correct.

Plaintiff's allegations that he was denied food at lunch one day, given a diet he did not
like as punishment, and given food that his religion does not allow him to eat on one occasion are
insufficient to raise a triable issue of fact that Defendants violated his Eighth Amendment rights.
*See Gill v. Hoadley*, 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003) (finding that complaint failed to
state Eighth Amendment claim where prisoner alleged he was denied one meal); *Shakur v.
Selsky*, 391 F.3d 106 (2d Cir. 2004) (prisoner stated *First Amendment* claim where he alleged
that he was denied one religiously significant feast).  Therefore, the Court dismisses Plaintiff's
Eighth Amendment claims regarding the denial of food.

To the extent that Plaintiff claims that the imposition of the loaf diet violated his right to
due process, the claim is *sua sponte* dismissed.  In order to state a claim for violation of his
procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was
deprived of a liberty interest without due process of law.  *Tellier v. Fields*, 280 F.3d 69, 79-80
(2d Cir. 2000).  An inmate has a liberty interest where (1) the state has granted its inmates, by
regulation or statute, an interest in remaining free from that particular confinement or restraint;
and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate
in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995);
*Tellier*, 280 F.3d at 80; *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996). The Second Circuit
has held that the imposition of a loaf diet does not impose an atypical and significant hardship on
inmates, even where the inmate alleges that the diet caused severe stomach pain and weight loss.
*McEachin v. McGuinnis*, 357 F.3d 197 (2d Cir. 2004).  Therefore, any due process claim

34

regarding the loaf diet is dismissed.

5.    Recreation and Movement

Plaintiff alleges that he was not allowed "any recreation or any movement outside his cell" when Defendant Segovis was assigned to his block.  (Dkt. No. 1 at 17.)  Defendants do not address this claim in their memorandum of law.[17]

Prisoners have the right under the Eighth Amendment to be allowed "some opportunity for exercise."  *Williams v. Greifinger*, 97 F.3d 699, 704 (2d Cir. 1996).  Plaintiff's complaint, however, does not plausibly allege facts suggesting that this right was violated.  Interference with prisoners' recreation must be quite severe in order to state an Eighth Amendment claim.  *See Branham v. Meachum*, 77 F.3d 626, 630-31 (2d Cir. 1996) (officers who denied inmate outdoor exercise for twenty-two days did not violate Eighth Amendment).  Therefore, the Court *sua sponte* dismisses Plaintiff's claims regarding the denial of recreation and movement.

6.    Showers

Plaintiff alleges that Defendant Segovis would not allow him to shower on August 19, 2009.  (Dkt. No. 1 at 17.)  Plaintiff alleges that when he told Defendant DePalo that he had not been allowed to shower, Defendant DePalo said "That's life in F-block for Muslims."  *Id.*  Defendants do not address this claim in their memorandum of law.[18]

---

[17]    Although Defendants do not discuss the issue in their memorandum of law, Defendant Segovis declares that inmates in the Special Housing Unit have one recreation period per day, for which they are required to sign up in advance.  (Dkt. No. 55-18 ¶ 16.)  Defendant Segovis escorts any inmates who sign up to recreation.  *Id.* ¶ 17.  Defendant Segovis declares that Plaintiff "rarely signed up for recreation" during his shift.  *Id.* ¶ 18.

[18]    Although Defendants' memorandum of law does not address this claim, Defendant DePalo declares that at "no time did I derogate [P]laintiff's religion or act in an

The denial of one shower does not violate the Eighth Amendment.  *McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) ("a two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs'").  Therefore, the Court dismisses Plaintiff's claim *sua sponte*.

      7.   <u>Bibles</u>

Plaintiff alleges that Defendants Segovis and Powers refused to give Plaintiff two Bibles that a chaplain delivered for him.  (Dkt. No. 1 at 16.)  Defendants' memorandum of law does not address this claim.

The allegation about the Bibles fails to state an Eighth Amendment claim because Plaintiff does not plausibly allege that he was denied "the minimal civilized measure of life's necessities" as a result of the deprivation.  The Court can find no authority suggesting that even a permanent deprivation of the Bibles would rise to that level.  Here, Plaintiff received the Bibles twelve days after the chaplain originally delivered them.  (Dkt. No. 55-6 at 28.)  Therefore, Plaintiff's Eighth Amendment claim regarding the Bibles is *sua sponte* dismissed.

The allegation about the Bibles also fails to state a procedural due process claim.  "[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available."  *Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (emphasis omitted).  This Circuit has held that "confiscation . . . [does] not constitute a Fourteenth Amendment violation for loss of property because of the availability

---

unprofessional manner toward him."  (Dkt. No. 55-4 ¶ 23.)

of state court post-deprivation remedies" in the New York Court of Claims. *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir. 1996); *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir. 2001); *see also Parratt v. Taylor,* 451 U.S. 527, 544 (1981) ("Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process."), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S. 327 (1986). Therefore, Plaintiff's claim regarding the deprivation of the two Bibles is dismissed.

8.      Verbal Abuse

Defendants argue that, to the extent that Plaintiff alleges that his constitutional rights were violated by comments by Defendants DePalo and Winchip regarding Muslims, such claims should be dismissed. (Dkt. No. 55-23 at 20.) Defendants are correct. Verbal harassment, in and of itself, does not rise to the level of a constitutional violation. *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 364 (N.D.N.Y. 2010); *Ramirez v. Holmes*, 921 F. Supp. 204, 210 (S.D.N.Y. 1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983."). Therefore, Defendants' motion for summary judgment dismissing these claims is granted.

**G.     Religion Claims**

Plaintiff alleges that Defendants Rock and Bellamy[19] violated his right to exercise his

---

[19]      Plaintiff alleges that Defendants Rock and Bellamy are responsible for violating his religious rights. (Dkt. No. 1 at 18.) Defendant Rock, who was the Superintendent of Great Meadow when Plaintiff was incarcerated there, was "responsible for the overall administrative functioning of the facility." (Dkt. No. 55-12 ¶ 3.) He was therefore personally involved in the implementation of the Directive at Great Meadow. The evidence does not show, however, any personal involvement by Defendant Bellamy with implementation of the Directive at Great Meadow. Defendant Bellamy is the Director of the Inmate Grievance Program. (Dkt. No. 55-6 ¶

religion.  (Dkt. No. 1 at 18-19.)  Defendants move for summary judgment of these claims.  (Dkt.

No. 55-23 at 20-28.)

    1.   Meals

Plaintiff alleges that Defendant Rock violated his right to exercise his religion because

Great Meadow Correctional Facility does not provide a Halal diet.  (Dkt. No. 1 at 19.)

Defendants move for summary judgment dismissing this claim, arguing that the religious

alternative meals provided at Great Meadow meet Plaintiff's religious dietary requirements.

(Dkt. No. 55-23.)  Defendants are correct.

The Second Circuit has "clearly established that a prisoner has a right to a diet consistent

with his or her religious scruples."  *Ford*, 352 F.3d at 597.  However, "[a]ll that is required for a

prison diet not to burden an inmate's free exercise of religion is the provision of a diet sufficient

to sustain the prisoner's good health without violating [his religion's] dietary laws."  *Muhammad*

*v. Warithu-Deen Umar*, 98 F. Supp. 2d 337, 344 (W.D.N.Y. 2000) (citing *Abdul-Malik v. Goord*,

No. 07 Civ. 4584, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at *6 (S.D.N.Y. Feb. 27,

1997)).[20]

Defendant Rock declares that DOCCS "has proscribed the use of what is called a[]

Religious Alternative Meal program to accommodate non[-]Kosher religious dietary

---

12.)   Therefore, Defendants' motion for summary judgment dismissing the claims against
Defendant Bellamy for lack of personal involvement (Dkt. No. 55-23 at 12) is granted.
Hereafter, I will refer to Plaintiff's religion claims as being brought solely against Defendant
Rock.

[20]       Defendants served a copy of this unpublished decision on Plaintiff with their
moving papers.  (Dkt. No. 55-23 at 105.)

requirements."  (Dkt. No. 55-12 ¶ 47.)  He further declares that the alternative meal "provides a

nutritionally adequate diet and meets Islamic requirements regardless of sect."  *Id*. ¶ 50.  Courts

have consistently held that DOCCS' Religious Alternative Meal is sufficient to sustain Muslim

prisoners' good health without violating dietary laws and that a strictly Halal diet is not required.

*Muhammad*, 98 F. Supp. 2d at 343-44 (collecting cases).  Therefore, Defendants' motion for

summary judgment dismissing Plaintiff's claim regarding the failure to provide Halal meals is

granted.

       2.    <u>Restrictions on Demonstrative Prayer</u>

DOCCS Directives limit prisoners' freedom to demonstratively pray.  Specifically,

DOCCS Directive 4202(k) states that "[i]ndividual demonstrative prayer by inmates will only be

allowed in the privacy of their own living quarters and in designated religious areas whenever

feasible as determined by the Superintendent."  (Dkt. No. 55-12 ¶ 9.)  Plaintiff argues that the

Directive as implemented at Great Meadow violates his right to practice his religion.  (Dkt. No. 1

at 18, 20.)  Defendants argue that this claim should be dismissed.  (Dkt. No. 55-23 at 25-26.)

The Court will address this claim under both the Free Exercise Clause of the First Amendment

and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

       a.    *First Amendment*

Prisoners retain some measure of the constitutional right to the free exercise of religion

guaranteed by the First Amendment.  *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003).

However, due to the unique concerns of the prison setting, prisoners' free exercise rights must be

balanced against the interests of prison officials engaged in the complex duties of administering

the penal system.  *Id*.  Thus, a prison regulation that denies a prisoner the ability to engage in a

religious exercise "is judged under a reasonableness test less restrictive than that ordinarily

applied [to burdens on fundamental rights]: a regulation that burdens a [prisoner's] protected

right passes constitutional muster if it is reasonably related to legitimate penological interests."

*Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (quoting *O'Lone v. Estate of Shabazz*,

482 U.S. 342, 349 (1987) (punctuation omitted).

      To establish a free exercise claim, a prisoner "must show at the threshold that the

disputed conduct substantially burdens[21] his sincerely held religious beliefs." *Salahuddin*, 467

F.3d at 274-75 (citing *Ford*, 352 F.3d at 591). A religious belief is "sincerely held" when the

plaintiff subjectively, sincerely holds a particular belief that is religious in nature[22]. *Ford*, 352

F.3d at 590. Here, there is no dispute that Plaintiff sincerely believes that his religion requires

him to demonstratively pray several times each day.

      A prisoner's sincerely held religious belief is "substantially burdened" "where the state

puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly*

---

    [21]    Although the Second Circuit has applied the "substantial burden" test in its most
recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the
test. "The *Ford* court noted that the Circuits apparently are split over whether prisoners must
show a substantial burden on their religious exercise in order to maintain free exercise claims.
Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the
substantial burden requirement, the court would proceed as if the requirement applied. Likewise,
the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address
Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by
the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that
we should find any particular burdened religious practice to be peripheral or tangential to
[plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied."
*Pugh v. Goord*, 571 F. Supp. 2d 477, 497 n.10 (S.D.N.Y. 2008)(citations and some punctuation
omitted).

    [22]    However, in some cases "an asserted belief might be so bizarre, so clearly
nonreligious in motivation, so as not to be entitled to protection." *Frazee v. Illinois Dept. Of
Employment Security*, 489 U.S. 829, 834 n.2 (1989).

*v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (punctuation omitted) (holding that Rastafarian

prisoner's sincerely held religious belief that he was prohibited from submitting to a test for

latent tuberculosis was "substantially burdened" where he was forced to choose between

"submitting to the test or adhering to [his] beliefs and enduring medical keeplock.").

Defendants argue that the Directive does not substantially burden Plaintiff's sincerely

held religious beliefs because Plaintiff "has also admitted that prayer times do not always

coincide with recreation times and that he is only forced to choose occasionally." (Dkt. No. 55-

23 at 26, citing Dkt. No. 55-16 (Plaintiff's deposition) at 164-65.)

Defendant Rock declares that:

> An inmate housed at Great Meadow who wishes to pray during his
> recreation period has alternatives to demonstrative prayer in the yard.
> First, the inmate can make silent, non-demonstrative prayers while in
> Great Meadow's recreation yard. In addition, an inmate may choose
> to remain in his cell during the recreation period and, while in his
> cell, the inmate may pray demonstratively as he wishes. An inmate
> may choose to go back to his cell during a designated "go back,"
> whereby inmates may return to their cells from the recreation yard
> under the supervision of staff at a scheduled time. "Go Back"
> periods, however, are limited, and may not coincide with the exact
> point in time that an inmate wishes to perform the Salaah, inasmuch
> as inmates must be escorted while they are transported from the
> recreation yard to their cells, and vice versa, and [] only a finite
> number of correction officers work at Great Meadow at any time.

(Dkt. No. 55-12 ¶¶ 24-28.)

Defendant Rock asserted the same argument in *Smith v. Artus*, No. 9:07-CV-1150, 2010

U.S. Dist. LEXIS 104660, 2010 WL 3910086 (N.D.N.Y. Sept. 30, 2010).[23]  There, Judge

Mordue found that:

---

[23]    Defendants served a copy of this unpublished decision on Plaintiff with their
moving papers. (Dkt. No. 55-23 at 120.)

> The question therefore becomes whether having to choose between attending recreation . . . or fulfilling his obligation to pray Salaah in a demonstrative manner would substantially burden plaintiff's religious rights. Although facts produced at trial may show otherwise, the present record, when viewed in the light most favorable to plaintiff, shows that plaintiff's free exercise rights were substantially burdened by defendants' policy of requiring plaintiff to either forego his Salaah prayer or give up other privileges accorded him as an inmate.

*Smith*, 2010 U.S. Dist. LEXIS 104660, at *36-37, 2010 WL 3910086, at *12.  Judge Mordue's analysis is persuasive and thus the Court finds that there is a triable issue of fact that the Directive substantially burdened Plaintiff's sincere religious beliefs.

Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct."  *Salahuddin*, 467 F.3d at 275.

Defendant Rock's declaration discusses, at length, the penological interests on which the Directive is based.  Specifically, he declares that:

> Demonstrative prayer singles individuals out as members of a particular religious group.  This is particularly true of Muslim inmates performing the Salaah, which includes, among other things, kneeling down, bending forward, touching the forehead to the ground, and motioning with the hands and arms.  When inmates of a particular faith are involved in an incident, other inmates of the same faith are likely to involve themselves in the incident to protect someone from "their group."  Identification of inmates' religious affiliation has also been known to lead to conflicts between different faith groups or different sects within a faith group.  These conflicts can escalate rapidly placing staff and other inmates at serious risk of physical injury or death, and threaten the facility's overall security.  In the recreation yard, where hundreds of inmates are gathered at one time, this easily could lead to large-scale violent incidents.  During the confusion created by such incidents, an inmate may attempt to escape from the facility or inmates may attempt to take over the prison.

42

Demonstrative prayer in the yard also negatively impacts staff's ability to control inmates.   When an inmate is engaged in demonstrative prayer in the recreation yard, that inmate is likely to ignore legitimate direct orders from staff.   The inmate praying demonstratively may view the interruption as an insult to his or her religion, and the perceived insult may lead to conflict between staff and the inmate.  Staff may be hesitant to interrupt an inmate engaged in demonstrative prayer out of respect for the religious significance of the prayer, and thus be impeded in their attempt to communicate necessary information to the inmate or carry out direct orders or tasks associated with that inmate.   This, in turn, disrupts the order of the facility and may adversely impact related safety concerns.  As noted above, because the inmate's religion has been identified by his demonstrative prayer, when these conflicts occur, other inmates may join in the conflict, rapidly escalating the situation.   Whether the inmate ignores a direct order or staff is unwilling to disrupt prayer, the end result is a diminution of staff's control over the recreation yard and an increased risk to the safety and security of the facility.

I am informed by my attorneys that plaintiff is asserting that these security concerns do not apply to inmates housed in the Behavioral Health Unit (BHU) because they are isolated during recreation periods.   However, the fact that inmates in BHU and the Special Housing Unit (SHU)[] take recreation in isolated recreation yards does not significantly alter these security and staffing concerns.  The recreation yards adjacent to the BHU and SHU are small pens designed for use by one inmate at a time.  They abut one another, and although solitary, they are not private and may be observed by other members of the inmate population.  Thus, the religious preferences of inmates engaging in demonstrative pray[er] in the BHU and SHU recreation yards would still be identifiable by other inmates, and staff would still have diminished control over inmates praying demonstratively.  Moreover, from an administrative perspective, it is better to require staff to apply Directive 4202 across the board to all members of the inmate population without exception.  In this way, both staff and inmates know exactly what is allowed and what is not allowed.  There are no errors of discretion, no favors, no favoritism, and no room for inmates in general population to become disruptive as a result of their belief that inmates in BHU or SHU are receiving special privileges.

(Dkt. No. 55-12 ¶¶ 11-34.)

Judge Mordue concluded in *Smith* that the security concerns identified by Defendant Rock satisfied the burden of showing that legitimate penological interests supported the Directive's ban on demonstrative prayer in the recreation yards at Great Meadow.  *Smith*, 2010 U.S. Dist. LEXIS 104660, at \*41-42, 2010 WL 3910086, at \*14.  The undersigned agrees. "Prison security and penological institutional safety goals are indeed a most compelling governmental interest . . . " *Campos v. Coughlin*, 854 F. Supp. 194, 207 (S.D.N.Y. 1994) (Sotomayor, J.); s*ee also Orafan v. Goord*, 411 F. Supp. 2d 153, 160 (N.D.N.Y. 2006), *rev'd on other grounds*, *Orafan v. Rashid*, 249 Fed. App'x 217 (2d Cir. 2007).

Therefore, the burden shifts to Plaintiff to show that the concerns articulated by Defendant Rock are irrational.  *Salahuddin*, 467 F.3d at 275.  When determining whether the burden imposed by the defendants is reasonable rather than irrational, a court evaluates four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests.  *Salahuddin*, 467 F.3d at 274-75.

Defendant Rock declares here, as he did in *Smith*, that the Directive's ban on demonstrative prayer in recreation yard at Great Meadow is rational because:

> Great Meadow's "big recreation yard is approximately 5 acres, and during a typical recreation period, between 100 and 400 inmates are present in the yard, depending on the weather.  In the morning, one sergeant and six correction officers are assigned to the yard to supervise the inmates during recreation.  In the afternoon, one sergeant and eight correction officers are assigned to the yard and in the evening, one sergeant and twelve correction officers are assigned

to the yard.  In these large areas of a facility such as the yard or the mess hall, prisoners substantially outnumber staff, and these are areas of a facility where unusual incidents such as serious fights and assaults will typically occur.  BHU and SHU recreation periods run on parallel schedules.  Fewer staff are assigned because BHU and SHU inmates are released to the yard individually but must be escorted by at least two officers.  BHU and SHU populations, even though isolated from the general population, tend to be more unpredictable and difficult to control.   These populations often present greater safety and security risks for staff.  When an inmate becomes involved in a conflict situation in one area of the facility, staff must be diverted from other areas of the facility to back up the staff assigned to the location where the incident is occurring.  During recreation periods the diversion of staff away from more populated areas or escort responsibilities to address incidents with BHU or SHU inmates can be dangerous, and creates critical security concerns.  During such incidents, inmates and staff are placed at risk of sustaining serious physical injury or death.  Further, during the confusion created by such incidents, an inmate may attempt to escape from the facility or inmates may attempt to take over the prison.  It is imperative, therefore, that rules and regulations designed to minimize the potential for conflict, and the drain on human resources be implemented, across the board, without exception.   This is particularly true in the current economic climate as, upon information and belief, there are no resources available to hire additional facility staff, and DOCS is being encouraged to reduce the number of hours that staff may work overtime.

(Dkt. No. 55-12 ¶¶ 36-45.)

In *Smith*, the plaintiff opposed the defendants' motion for summary judgment.  In his opposition, the plaintiff argued that the Directive's ban on demonstrative prayer in the recreation yard at Great Meadow was an irrational response to the concerns articulated by Defendant Rock because (1) the Directive contains other provisions explicitly allowing religious behaviors that single out members of particular faith groups, such as wearing distinctive head coverings and facial hair and being served on different colored trays in the mess hall; (2) officers are just as likely to lose control over inmates praying non-demonstratively, which is allowed under the

Directive, as they are over inmates praying demonstratively; (3) other activities in the recreation yard - such as sports - also lead to conflict but are permitted; and (4) demonstrative prayer is allowed in the recreation yards at other facilities. *Smith*, 2010 U.S. Dist. LEXIS 104660, at *42-26, 2010 WL 3910086, at *14-15. Judge Mordue found that the plaintiff had raised a triable issue of fact that the Directive was an irrational response to the facility's legitimate penological interests. *Smith*, 2010 U.S. Dist. LEXIS 104660, at *47-48, 2010 WL 3910086, at *16.

In *Smith*, the plaintiff asserted that the alternatives that the facility offered to praying in the recreation yard - namely, non-demonstrative prayer or staying in his cell at recreation time to pray - were not reasonable. *Smith*, 2010 U.S. Dist. LEXIS 104660, at *48-53, 2010 WL 3910086, at *16-17. Judge Mordue found that the plaintiff had raised a triable issue of fact regarding the reasonableness of the facility's alternatives. *Id*.

In *Smith*, Judge Mordue found that the same issues that raised a triable issue of fact regarding the rationality of the Directive also raised a triable issue regarding the third *Turner* factor, which considers the impact on guards, inmates, and prison resources. *Smith*, 2010 U.S. Dist. LEXIS 104660, at *53-54, 2010 WL 3910086, at *17.

Finally, in *Smith* the plaintiff proposed alternatives to the Directive's ban on demonstrative prayer in the recreation yard - for instances, adding an additional "Go Back" period for Muslim inmates or setting aside an area of the recreation yard for prayer. *Smith*, 2010 U.S. Dist. LEXIS 104660, at *54-56, 2010 WL 3910086, at *18. Judge Mordue found that Plaintiff had raised a triable issue of fact that the facility could accommodate Muslims' need to demonstratively pray by designating an area of the recreation yard for prayer. *Smith*, 2010 U.S. Dist. LEXIS 104660, at *57-58, 2010 WL 3910086, at *19.

Thus, in *Smith*, Judge Mordue found that there was a triable issue of fact that the very policy challenged by Plaintiff in this case - Great Meadow's implementation of DOCCS Directive 4202(k) banning demonstrative prayer in the recreation yard - violated Muslim inmates' free exercise rights.

However, unlike the plaintiff in *Smith*, Plaintiff here has not opposed Defendants' motion for summary judgment.  Thus, Plaintiff here has not met his burden of showing that the concerns articulated by Defendant Rock are irrational.

Even if Plaintiff had opposed the motion and met his burden, Defendants would be entitled to summary judgment on Plaintiff's free exercise claim because (1) the doctrine of qualified immunity shields them from liability for damages; and (2) Plaintiff's request for injunctive relief is moot.

The affirmative defense of qualified immunity "shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Stephenson v. Doe*, 332 F.3d 68, 76 (2d Cir.2003) (quoting *McCardle v. Haddad*, 131 F.3d 43, 50 (2d Cir.1997)).  A qualified immunity inquiry in prisoner civil rights cases generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted."  *Sira v. Morton*, 380 F.3d 57, 68–69 (2d Cir.2004) (citations omitted); accord, *Higazy v. Templeton*, 505 F.3d 161, 169 n. 8 (2d Cir.2007) (citations omitted).  In the context of religion claims, the Supreme Court and the Second Circuit have "expressly cautioned against framing the constitutional right at too broad a level of generality."

47

*Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010) (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).  The Second Circuit imposes a "'reasonable specificity' requirement on defining the contours of a constitutional right for qualified immunity purposes." *Id*.  Thus, conduct does not violate clearly established rights unless the Supreme Court or the Second Circuit has quite specifically held that conduct is unconstitutional.  *Id*.

Here, neither the Second Circuit nor the Supreme Court has held that the policy against demonstrative prayer in the solitary recreation pen at Great Meadow Correctional Facility violates prisoners' rights under the First Amendment or RLUIPA.  Indeed, *Smith* appears to be the only case on the issue.  Even if *Smith* was sufficient to create "clearly established statutory or constitutional rights," it would have no effect here because it was decided after Plaintiff filed this action.  Moreover, Judge Mordue dismissed the plaintiff's action in *Smith* on the basis of qualified immunity because "it still does not appear well established that an inmate has the right to pray demonstratively in the recreation yard."  *Smith*, 2010 U.S. Dist. LEXIS 104660, at *88, 2010 WL 3910086, at *29.  Therefore, Defendants are entitled to qualified immunity on Plaintiff's claim for money damages regarding demonstrative prayer.

Defendants argue that Plaintiff's claims for injunctive relief are moot because he is no longer housed at Great Meadow.  (Dkt. No. 55-23 at 10-11.)  Defendants are correct.  "It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility."  *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) (per curiam).  Plaintiff has not been housed at Great Meadow since October 2009.  (Dkt. No. 7.) Therefore, his request for injunctive relief is moot.

Accordingly, Defendants' motion for summary judgment dismissing Plaintiff's First

Amendment claim regarding the ban on demonstrative prayer is granted.

        b.     *RLUIPA*

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution[24] . . . unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a).

In *Smith*, Judge Mordue found that the plaintiff had raised a triable issue of fact that Great Meadows' ban on demonstrative prayer violated RLUIPA for the same reasons that he articulated regarding the First Amendment.  *Smith*, 2010 U.S. Dist. LEXIS 104660, at *58-62, 2010 WL 3910086, at *19-20.  However, he found that the defendants were entitled to qualified immunity. *Smith*, 2010 U.S. Dist. LEXIS 104660, at *89, 2010 WL 3910086, at *29.

Here, even if Plaintiff had raised a triable issue of fact, Defendants would be entitled to summary judgment dismissing the RLUIPA claim for two reasons. First, money damages are not available under RLUIPA.  *Sossamon v. Texas*, 131 S.Ct. 1651 (2011).  Second, as discussed above, Plaintiff's claims for injunctive relief are moot.  Therefore, Defendants' motion for summary judgment dismissing Plaintiff's RLUIPA claim regarding the ban on demonstrative prayer is granted.

---

     [24]     An "institution" is any facility or institution that is "owned, operated, or managed by, or provides services on behalf of any State" and is, *inter alia*, "for persons who are mentally ill, disabled, or retarded, or chronically ill or handicapped" or "a jail, prison, or other correctional facility."  42 U.S.C. § 1997(1) (2010).

3.     Access to Personal Razor

Plaintiff alleges that Defendants violated his religious rights by refusing to allow him a razor or clippers to shave his pubic hair and armpits.  (Dkt. No. 1 at 19.)  Defendants argue that their refusal to give Plaintiff a personal razor is supported by legitimate health and safety concerns because inmates in the SHU and BHU, where Plaintiff resided at Great Meadow, "are there because they have threatened to . . . commit suicide, inflict self harm, or because they have assaulted staff or other inmates."  (Dkt. No. 55-23 at 27.)  Even if Plaintiff had raised a triable issue of fact regarding the merits of this claim, Defendants are entitled to summary judgment on the basis of qualified immunity.  The Court can find no Supreme Court or Second Circuit authority holding that prisoners are entitled to possess a personal razor or clippers to perform grooming mandated by their religion.   Additionally, as discussed above, Plaintiff's requests for injunctive relief are moot because he is no longer housed at Great Meadow.  Therefore, Defendants' motion for summary judgment dismissing this claim is granted.

**H.     Claim Against Defendant Karandy**

Defendants argue that complaint fails to state that Defendant Karandy was personally involved in any of the alleged constitutional violations.  (Dkt. No. 52-33 at 11-12.)  Defendants are correct.

Under Second Circuit precedent, "'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.  *Bass v.*

*Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).  Here, the complaint includes Defendant Karandy in the list of defendants but does not contain any allegations about any acts or omissions by Defendant Karandy.  (Dkt. No. 1 at 9.)  Therefore, I grant Defendants' motion for summary judgment and dismiss the claim against Defendant Karandy.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 55) is **GRANTED IN PART AND DENIED IN PART**.  All claims are dismissed with the exception of: (1) the excessive force claim against Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers; (2) the excessive force claim against Defendants Hamel, Murray, and Stemp; and (3) the claim against Defendant Segovis regarding the handcuffing incident; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy *Butler v. Gonzalez,* No. 09 Civ. 1916, 2010 U.S. Dist. LEXIS 108244, 2010 WL 3398156 (S.D.N.Y. May 18, 2010) in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

IT IS SO ORDERED

Dated: September 24, 2010

Thomas J. McAvoy

Senior, U.S. District Judge

Westlaw.

Slip Copy, 2010 WL 3398156 (S.D.N.Y.)
**(Cite as: 2010 WL 3398156 (S.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.
Willie BUTLER, Plaintiff,
v.
C.O. GONZALEZ and C.O. Richard, Defendants.

No. 09 Civ.1916(PAC)(THK).
May 18, 2010.

### REPORT AND RECOMMENDATION

THEODORE H. KATZ, United States Magistrate Judge.

**\*1 TO: HON. PAUL A. CROTTY, UNITED STATES DISTRICT JUDGE FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE**

Plaintiff Willie Butler ("Plaintiff"), proceeding *pro se*, brings this prisoner's civil rights action against Defendants Correction Officers Julio Gonzalez ("Gonzalez") and Jean Richard ("Richard") (collectively, "Defendants"). Plaintiff alleges that, in January 2009, Defendant Gonzalez beat him up in a secluded stairwell at the Sing Sing Correctional Facility, while Defendant Richard stood by idly and verbally abused Plaintiff. As a result, Plaintiff sustained injuries to his right eye, back, and head. Plaintiff also claims that Defendants denied him medical care following the beating. (*See* Amended Complaint, dated June 29, 2009 ("Am.Compl."), at 3.)

Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendants contend that Plaintiff's claims are supported only by his deposition testimony, which is uncorroborated and/or inconsistent such that no reasonable jury could find in Plaintiff's favor. (*See* Defendants' Memorandum of Law in Support of Motion for Summary Judgment, dated Jan. 26, 2009 ("Defs.' Mem."), at 5-9.) Defendants also argue that,

even if the Court accepts Plaintiff's version of events as true, his injuries are *de minimis,* and Plaintiff cannot sustain his Eighth Amendment excessive force claim. (*See id.* at 10-11.) Defendants do not address Plaintiff's claim for denial of medical care.

For the reasons that follow, the Court recommends that Defendants' motion for summary judgment be denied.

### BACKGROUND

Plaintiff is a prisoner incarcerated in Sing Sing Correctional Facility ("Sing Sing"). Defendants are correction officers who worked at Sing Sing during the relevant period. Plaintiff's claims arise out of a confrontation he had with Defendants on January 2, 2009. (*See* Am. Compl. at 1-3; Defendants' Statement Pursuant to Local Civil Rule 56.1 ("Defs.' 56.1 Stmnt."), ¶¶ 1-2.)

### I. The January 2, 2009 Incident[FN1]

> FN1. Neither Defendants nor any witnesses to the incident on January 2, 2009 have submitted affidavits attesting to their version of events. Therefore, the facts relating to what took place on January 2 are primarily drawn from Plaintiff's deposition testimony.

On the evening of January 2, 2009, Plaintiff called his wife in Virginia from a telephone at Sing Sing located outside of the facility's gym. According to Plaintiff, prisoners are routinely allotted thirty minutes of telephone use at a time. Correction Officer ("C.O.") Simpson, who had only recently been assigned to monitor the phones at Sing Sing, told Plaintiff he could only use the phone for fifteen minutes. As Plaintiff discussed the facility's phone policy with C.O. Simpson, Defendant Richard appeared "out of nowhere" and ordered Plaintiff to stand against the wall. Defendant Richard then left the area. (*See* Exhibit A to Declaration of Donald Nowve, dated Jan. 26, 2010 ("Nowve Decl."), Plaintiff's Deposition Transcript, dated Nov. 6, 2009 ("Pl.'s Depo."), at 35-36, 91-94, 103.)

Shortly thereafter, Defendant Richard returned

Slip Copy, 2010 WL 3398156 (S.D.N.Y.)
**(Cite as: 2010 WL 3398156 (S.D.N.Y.))**

with Defendant Gonzalez, and the two officers took Plaintiff "outside the gate" to a secluded area near a back stairwell.[FN2] Once out of sight of C.O. Simpson, Defendant Gonzalez asked Plaintiff if he had a problem with the officer, to which Plaintiff replied he did not. Defendant Gonzalez then ordered Plaintiff to remove his clothes and put his hands on the wall.[FN3] Next, Defendant Gonzalez searched Plaintiff, but found nothing. (*See id.* at 37-38, 95, 98.)

> [FN2.] Plaintiff contends that another inmate, "D. Smith," witnessed Defendants' removal of Plaintiff from the area near the telephones. (*See* Pl.'s Depo. at 83.) In an interview with Sing Sing personnel, Mr. Smith allegedly stated "he did not wish to be interviewed and ... had no knowledge of the incident involving plaintiff." (*See* Letter from Donald Nowve to the Court, dated Jan. 6, 2010, Docket Entry 18.) Neither party sought to depose Mr. Smith.

> [FN3.] Plaintiff has offered contradictory accounts as to whether Defendant Gonzalez ordered him to strip completely naked, or whether Plaintiff remained in his boxers and a t-shirt. (*Compare* Am. Compl. at 3, *with* Pl.'s Depo. at 99.) As this fact addresses only Plaintiff's credibility, it is immaterial to the instant motion, and requires no further discussion.

**\*2** As Plaintiff was getting dressed, Defendant Gonzalez punched Plaintiff in his right eye and "busted [it] wide open." (*Id.* at 40.) Plaintiff grabbed his bleeding eye and fell to his knees. Defendant Gonzalez continued to beat Plaintiff repeatedly with his fists as Defendant Richard watched and laughed. (*See id.* at 38-40, 99.) Defendant Richard, rather than intervene, allegedly told Plaintiff, "[You're] a little bitch. Talk that smart shit now." (Am. Compl. at 3; *see also* Pl.'s Depo. at 39.) Plaintiff "pleaded and begged" for medical assistance, but neither officer responded. (*See* Pl.'s Depo. at 38-39.)

In the midst of this incident (which lasted approximately one minute), an alarm went off in the facility. Defendant Gonzalez immediately left the area to respond to the alarm, and Defendant Richard escorted Plaintiff back to his cell. (*See id.* at 41, 101-02.)

Once back at his cell, Plaintiff got the attention of an (unidentified) prisoner using a telephone outside Plaintiff's cell, and asked the prisoner to call Plaintiff's wife. The prisoner agreed to help, and Plaintiff wrote his wife's phone number and his inmate number on a piece of paper, and tossed it towards the prisoner through the cell bars. The prisoner then called Plaintiff's wife and alerted her to what had happened.[FN4] (*See id.* at 46-48, 102-03.)

> [FN4.] Sing Sing telephone records, which were introduced at Plaintiff's deposition, confirm that several calls were placed to Plaintiff's wife on January 2, both before and after the alleged beating occurred. (*See* Pl.'s Depo. at 112-14.) Neither party has submitted these records in connection with the instant motion.

Neither Defendant Gonzalez nor Defendant Richard has submitted an affidavit expressly denying Plaintiff's allegations, or suggesting a reason why the alleged use of force was necessary. Instead, Defendants ask the Court to infer that the incident never occurred based on the lack of corroborating evidence in Plaintiff's medical records, and the absence of administrative records reflecting a use of force incident involving Plaintiff and Defendants on January 2. (*See* Defs.' 56.1 Stmnt. ¶ 7; Declaration of Jeffrey DeLoatch, dated Jan. 12, 2010 ("DeLoatch Decl."), ¶ 5.)

**II. Plaintiff's Medical Treatment and Records**

Plaintiff contends that several officers and Sing Sing personnel passed by his cell later that night and in the coming days, but none offered him any medical assistance despite Plaintiff's calls for help.[FN5] Plaintiff states that he was "locked in [his] cell" for four days, until, on January 6, he received medical treatment for his eye. (*See id.* at 56-58, 105-09, 117-20.)

> [FN5.] Plaintiff does not assert claims against any of these individuals, although he did identify some of them at his deposition. (*See* Pl.'s Depo. at 44-45, 78-79, 89, 105-06.)

On January 6, Plaintiff claims that his eye "started looking real nasty," and a female nurse passing by his cell noticed this and sent him to an outside hospital-Westchester Medical Center ("WMC")-where Plaintiff asserts he received sutures in his right eye. (*See id.* at 49, 62-63, 117.) Neither the Watch Com-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3398156 (S.D.N.Y.)
**(Cite as: 2010 WL 3398156 (S.D.N.Y.))**

mander's logbook at Sing Sing nor Plaintiff's medical referral history, also maintained at Sing Sing, indicates that Plaintiff was transported to an outside hospital on January 6. (*See* DeLoatch Decl. ¶ 8; Declaration of Maria Jones, R.N., dated Jan. 19, 2010 ("Jones Decl."), ¶ 7 & Ex. A.) Similarly, no records exist at WMC reflecting a visit by Plaintiff for any reason on January 6. (*See* Supplemental Declaration of Donald Nowve, dated Apr. 27, 2010 ("Nowve Supp. Decl."), Ex. A.) [FN6] In addition, none of the records at Sing Sing reflects that Plaintiff received sutures to his right eye at any time in January 2009. (*See* Jones Decl. ¶ 10.) Sing Sing personnel state that if an inmate receives sutures, he is confined to the infirmary when he returns from the outside facility. Plaintiff was not confined to the Sing Sing infirmary in January 2009. (*See id.* ¶ 12.)

> **FN6.** Pursuant to this Court's Order, dated March 18, 2010, Plaintiff had until May 11, 2010 to respond to Defendants' supplemental submission. To date, Plaintiff has not responded.

**\*3** Plaintiff's medical records indicate that he was evaluated at Sing Sing by Nurse Patricia Conklin, on January 6, for issues relating to a pre-existing cardiac condition. (*See* Jones Decl. ¶ 8 Ex. A.) Plaintiff also visited the Sing Sing clinic for a similar issue on January 8. (*See id.*) Neither Nurse Conklin nor the examining doctor/nurse from the January 8 visit has submitted an affidavit attesting to his or her observations of Plaintiff on those particular dates. Nevertheless, none of the medical records provided for these visits mentions any sutures or injury to Plaintiff's eye or face.

Plaintiff's records do note, however, that he was transported to the emergency room at WMC on January 11. (*See id.* ¶ 9 & Ex. A .) Plaintiff contends that this was a followup appointment after his "eye busted back open." (Pl.'s Depo. at 67.) Defendants claim that this appointment related to a finger injury sustained in a weightlifting accident, and was Plaintiff's first trip to an outside hospital subsequent to January 2. (*See* Jones Decl. ¶ 9.) Indeed, the January 11 medical records do make reference to an injury to Plaintiff's pinky finger. (*See id.* Ex. A; *see also* Nowve Supp. Decl. Ex. A.) But, according to Plaintiff, his heart condition prohibits him from any strenuous athletic activity-including weightlifting-and this record was

altered. [FN7] (*See* Pl.'s Depo. at 49, 58, 63-64.) Plaintiff also claims that Dr. Bahski-the doctor who allegedly treated him on January 6 and 11 for his eye injury-was fired from Sing Sing for falsifying records. [FN8] (*See id.* at 64.) Regardless of whether or not Plaintiff was treated for a finger injury on January 11, the same medical records also state as follows:

> **FN7.** Although not submitted in connection with the instant motion by either party, Plaintiff produced a document at his deposition that allegedly confirms his statement that he is not permitted to lift weights or play sports due to a heart condition. (*See* Pl.'s Depo. at 64.) Nevertheless, Plaintiff also stated at his deposition that he "work[s] out every day." (*Id.* at 50.)

> **FN8.** Neither party has submitted anything to confirm or deny this allegation.

*The exam today shows a contusion (deep bruise) around the face or scalp* .... Usually the swelling from a contusion will be better in 2-3 days, but it takes 7-10 days for a "black eye" to clear up. You should apply ice packs to the injured area for about 20-30 minutes every 2-3[sic] for the first 2 days. Use mild pain medicine as needed.... There may be a mild headache, slight dizziness, nausea, trouble concentrating, and weakness for a few days.... Contact the doctor if any symptoms are continuing after 3 days. Anyone with a head injury must be regularly checked by a responsible person every 2 hours, for at least 24 hours after the injury.... Take Motrin for pain as needed. Follow up with your doctor in 1-2 weeks for further evaluation.
(Jones Decl. Ex. A (emphasis added).)

Plaintiff received additional medical treatment for various ailments throughout 2009, including his heart condition and a pre-existing cataract in his right eye. In several of those appointments, the medical records note Plaintiff's earlier eye injury, and, in Plaintiff's view, support his claim. For example, in Plaintiff's Ambulatory Health Record Progress Note ("AHR") from a medical appointment on August 17, 2009, the doctor noted: "states had sutures/butterfly to R[ight] eyebrow area Jan [uary] 3-Bahski seen and sent O [ut] S[ide] H[ospital]." (Jones Decl. Ex. A.) In another AHR from a sick call on September 1, 2009, the Sing Sing nurse wrote "Sent OSH re: R[ight] eye sutures

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3398156 (S.D.N.Y.)
**(Cite as: 2010 WL 3398156 (S.D.N.Y.))**

1/6/09 (copy of consult *NOT* on file)." (Declaration of Patricia Conklin, R.N., dated Jan. 19, 2010 ("Conklin Decl."), Ex. A.) An AHR from two days later states "inmate 'very concerned re: paperwork for OSH trip on R[ight] eye injury 1/09: *NOT* in medical records.' " (*Id.*)

**\*4** Defendants contend that any reference to sutures or an eye injury in Plaintiff's medical records from the Fall of 2009 are simply based on Plaintiff's self-reporting. (*See id.* ¶¶ 6-7.) Sing Sing medical personnel have been unable to confirm that Plaintiff received sutures at any time in 2009. Defendants have not, however, submitted an affidavit from Dr. Bahski, who allegedly treated Plaintiff in January for his injured eye.[FN9]

> **FN9.** Defendants place great weight on the medical records maintained at Sing Sing to support their conclusion that Plaintiff was not treated for an eye injury in January 2009. Yet, Plaintiff's medical referral history from Sing Sing does not appear to be entirely consistent with the underlying medical records. For example, although Plaintiff visited the Sing Sing clinic on January 6 for his heart condition (as noted in an AHR of the same date), Plaintiff's referral history contains no corresponding entries on that date. (*See* Jones Decl. Ex. A.) As January 6 is a date of great significance in this case, there is some reason to be skeptical about the accuracy of the Sing Sing records.

At his deposition, taken in November 2009, Plaintiff stated that his eye still bothers him. When he blinks, "it feels like something is rubbing in it." (Pl.'s Depo. at 70.) Plaintiff contends that this "irritat[ion]" is a result of the incident on January 2, and not from his cataract. (*See id.*)

**III. Exhaustion of Administrative Remedies**
Plaintiff filed a grievance with Sing Sing immediately after the incident. (*See id.* at 70.) From the date of his grievance through the filing of the Amended Complaint, Plaintiff has consistently maintained that Defendant Gonzalez beat him up on January 2 while Defendant Richard watched and taunted him, and, as a result, Plaintiff received sutures to his right eye on January 6. Plaintiff relayed this same story to medical personnel later in 2009 and again at his deposition in

November 2009. Despite the absence of substantial corroborating evidence, Plaintiff's story has not wavered.

The decision rejecting Plaintiff's grievance indicated that Defendants denied all of Plaintiff's allegations. (*See* Am. Compl. Ex. 2.) In addition, C.O. Simpson "d[id] not recall any type of unusual situations occurring in the phone area on that evening," and did not witness any use of force against Plaintiff. (*Id.*) Curiously, the interviewing officer repeatedly refers to C.O. Simpson as "he," despite the fact that C.O. Simpson is, in fact, a female officer. (*See id.*) Plaintiff claims that this error supports his contention that Sing Sing's internal investigation was a sham, if not completely concocted. Plaintiff appealed the denial of his grievance and fully exhausted his administrative remedies prior to filing the present suit. (*See id* . Exs. 3 & 4.)[FN10]

> **FN10.** Shortly after Plaintiff filed his grievance, he was brought up on several disciplinary charges at Sing Sing, all of which were eventually dropped. (*See* Am. Compl. Exs. 5 & 6.) Plaintiff does not assert any claims in connection with these charges. (*See* Pl.'s Depo. at 79.)

**DISCUSSION**
Defendants now move for summary judgment, arguing that (1) Plaintiff's version of events is supported only by his own testimony, which is uncorroborated and/or contradicted by the available documentary evidence, such that no reasonable jury could find in Plaintiff's favor; and (2) Plaintiff's injury, if any, is *de minimis,* and insufficient to support a claim for excessive force. (*See* Defs.' Mem. at 5-11.) Defendants do not address Plaintiff's claim for deprivation of medical care.

**I. Summary Judgment Standards**

A. *Federal* Rule 56

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3398156 (S.D.N.Y.)
**(Cite as: 2010 WL 3398156 (S.D.N.Y.))**

Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986); *Shannon v. N.Y. City Transit Auth.,* 332 F.3d 95, 98 (2d Cir.2003). The burden of demonstrating the absence of any genuine dispute as to material facts rests upon the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000). Once a properly supported motion for summary judgment has been submitted, the burden shifts to the nonmoving party to make a sufficient showing to establish the essential elements of the claims on which it bears the burden of proof at trial. *See Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 743 (2d Cir.2003); *Peck v. Pub. Serv. Mut. Ins. Co.,* 326 F.3d 330, 337 (2d Cir.2003) (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553).

**\*5** In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, courts are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006). However, the non-moving party must put forth "specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e) (2). A summary judgment "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-moving party may not rely on its pleadings, mere allegations, simple denials, conclusory statements, or conjecture to create a genuine issue for trial. *See Anderson,* 477 U.S. at 256-57, 106 S.Ct. at 2514; *Guilbert v. Gardner,* 480 F.3d 140, 145 (2d Cir.2007); *see also Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (non-moving party "must offer some hard evidence showing that its version of the events is not wholly fanciful").

At the summary judgment stage, "it is undoubtedly the duty of district courts not to weigh the credibility of the parties." *Jeffreys,* 426 F.3d at 554; *accord McClellan,* 439 F.3d at 144 (noting that "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury not for the court on a

motion for summary judgment"). Nevertheless, the United States Supreme Court has held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007); *see also Jeffreys,* 426 F.3d at 554 (stating that "where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account"). The moving party, however, is not relieved of its "burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor." *Jeffreys,* 426 F.3d at 554.

B. *Local Rule 56.1*

Under the Southern District of New York's Local Civil Rule 56.1, a party moving for summary judgment must submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civil Rule of the Southern District of New York 56.1(a) ("Local Rule 56.1"). Significantly, "[e]ach numbered paragraph in the statement of material facts set forth in the statement ... will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement ... by the opposing party." Local Rule 56.1(c). Both parties' statements must be "followed by citation to evidence which would be admissible" under Federal Rule of Civil Procedure 56(e). Local Rule 56.1(d). Finally, the moving party must provide notice in a separate document, to a non-moving, *pro se* party, that failure to comply with Local Rule 56.1 may result in dismissal of the case without trial. *See* Local Civil Rule of the Southern District of New York 56.2 ("Local Rule 56.2").

**\*6** A non-moving party's failure to adhere to Local Rule 56.1(b) can prove fatal because "[c]ourts in this circuit have not hesitated to deem admitted the facts in a movant's Local Rule 56.1 Statement that have not been controverted by a Local Rule 56.1 statement from the non-moving party." *Gadsden v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3398156 (S.D.N.Y.)
**(Cite as: 2010 WL 3398156 (S.D.N.Y.))**

*Jones Lang LaSalle Americas, Inc.,* 210 F.Supp.2d 430, 438 (S.D.N.Y.2002) (collecting cases); *see also Millus v. D'Angelo,* 224 F.3d 137, 138 (2d Cir.2000) (summary judgment "appropriate" in light of non-moving party's failure to comply with Local Rule 56.1(b)).

"A district court has broad authority, however, to overlook a party's failure to comply with local court rules in the interests of justice." *Pierre-Antoine v. City of New York,* No. 04 Civ. 6987(GEL), 2006 WL 1292076, at *3 (S.D.N.Y. May 9, 2006). For example, if a court determines, based upon its own review of the record, that a genuine dispute of material fact exists, "the court is not required to deem the fact admitted merely because the non-moving party has failed to submit a relevant counterstatement under Rule 56 .1." *Id.* Courts typically "extend extra consideration to pro se plaintiffs and ... pro se parties are to be given special latitude on summary judgment motions." *Sash v. United States,* 674 F.Supp.2d 531, 536 (S.D.N.Y.2009) (internal quotation marks and citations omitted).

## II. *Plaintiff's Local Rule 56.1 Statement*

Here, Plaintiff attempted to comply with Local Rule 56.1, by submitting what he titled a "Response to Movants' Contentions There Are No Genuine Issues with Respect to Listed Material Facts." (*See* Affidavit of Willie Butler, dated Dec. 15, 2009 ("Pl.'s Aff."), at 1.) Strangely, Plaintiff's submission *preceded* Defendants' Motion for Summary Judgment. Therefore, it does not directly respond to the statements in Defendants' 56.1 Statement. Plaintiff likely submitted his affidavit in response to the general assertion made by Defendants' attorney at Plaintiff's deposition that Defendants intended to move for summary judgment. (*See* Pl.'s Depo. at 130-31.)

In light of Plaintiff's *pro se* status and his attempt to comply with the Local Rules, the Court is hesitant to deem all facts in Defendants' Rule 56.1 Statement admitted for purposes of the instant motion. The Court, however, need not address the potential problems created by Plaintiff's premature affidavit, because Defendants' Rule 56.1 Statement consists mostly of Plaintiff's allegations (which Defendants presumably do not admit), and interpretations of Sing Sing administrative and medical records. (*See* Defs.' 56.1 Stmnt.) The latter is offered by Defendants to prove a negative-namely, that Plaintiff did *not* receive

treatment for an eye injury in January 2009. To the extent that Defendants present undisputed facts relating to Sing Sing administrative and medical records, which are supported by evidence in the record, they are deemed admitted. *See Allen v. City of New York,* 480 F.Supp.2d 689, 703 (S.D.N.Y.2007) ("If the opposing party fails to respond to the moving party's Rule 56.1 Statement, then the material facts contained in the moving party's statement are deemed admitted as a matter of law.") (citing *Giannullo,* 322 F.3d at 140); *see also Am. Med. Ass'n v. United Healthcare Corp.,* No. 00 Civ. 2800(LMM), 2007 WL 1771498, at *2 (S.D.N.Y. June 18, 2007).

**\*7** On the other hand, Defendants have submitted no affidavits from the Defendant officers themselves, any witnesses to the alleged beating or the surrounding events, or Dr. Bahski-who Plaintiff alleges treated him on January 6 and 11. Further, although Nurse Conklin apparently examined Plaintiff on January 6 for his cardiac condition (*see* Jones Decl. ¶ 8 & Ex. A), Nurse Conklin's affidavit makes no mention of her observations on that date. Therefore, in determining whether a genuine issue of fact exists as to the events of January 2, and Plaintiff's subsequent medical treatment, the Court will rely-to the extent possible-on Plaintiff's deposition transcript and his medical records from Sing Sing and WMC.

## III. Plaintiff's Excessive Force Claim

### A. *Legal Standard*

The Eighth Amendment, which applies to the States through the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishment. *See Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). An Eighth Amendment excessive force claim has both an objective and subjective component. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009); *see also* Hudson v. McMillan, 503 U.S. 1, 7-8, 113 S.Ct. 995, 999-1000 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

The subjective inquiry in excessive force cases examines a defendant's state of mind, and turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Blyden,* 186 F.3d at 262 (quoting *Hudson,* 503 U.S. at 7, 113 S.Ct. at 999). "Where no legitimate law enforcement or penological

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3398156 (S.D.N.Y.)
**(Cite as: 2010 WL 3398156 (S.D.N.Y.))**

purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind." *Boddie v. Schneider,* 105 F.3d 857, 861 (2d Cir.1997).

The objective inquiry in excessive force cases is "contextual and responsive to 'contemporary standards of decency.' " *Hudson,* 503 U.S. at 8, 113 S.Ct. at 999. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.... not even every *malevolent* touch by a prison guard gives rise to a federal cause of action." *Boddie,* 105 F.3d at 862 (internal quotation marks and citations omitted). But, when force is used maliciously and sadistically to cause harm, "contemporary standards of decency always are violated ... whether or not significant injury is evident." *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000; *accord* *Wright,* 554 F.3d at 268-69. Although the absence of a serious injury is relevant to the inquiry, "it is not a threshold requirement for an excessive force claim." *Abreu v. Nicholls,* No. 08-3567-pr, 2010 WL 726520, at *2 (2d Cir. Mar.3, 2010) (citing *Wilkins v. Gaddy,* --- U.S. ----, 130 S.Ct. 1175, 1178-79, --- L.Ed.2d ---- (2010)). "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000; *see also* *Wilkins,* 130 S.Ct. at 1178-79.

B. *Application*

1. *Did an Assault Occur?*

**\*8** In support of his excessive force claim, Plaintiff relies primarily on his deposition testimony. Defendants, citing a line of cases in this Circuit, argue that Plaintiff's testimony is incredible, and therefore, summary judgment is appropriate. (*See* Defs.' Mem. at 7-9; *see also* Defendants' Supplemental Memorandum of Law, dated Apr. 27, 2010 ("Defs.' Supp. Mem."), at 6-7.) Those cases, however, involved plaintiffs whose own fanciful testimony was riddled with inconsistencies and flatly contradicted by substantial evidence. *See* *Jeffreys,* 426 F.3d at 552-53 (plaintiff, caught in the act of burglarizing a school, alleged police officers beat him up and then threw him from a third-floor window, despite the fact that plaintiff confessed on three separate occasions to jumping out of the window, and the medical evidence indicated that all of

plaintiff's injuries were as a result of his fall, and not any beating at the hands of police); *Slacks v. Gray,* No. 07 Civ. 510(NAM)(GJD), 2009 WL 3164782, at *1 (N.D.N.Y. Sept. 29, 2009) (plaintiff gave six different versions of the events, from the filing of the grievance through his deposition, which were contradicted by undisputed medical evidence and photographs); *Shabazz v. Pico,* 994 F.Supp. 460, 469-70 (S.D.N.Y.1998) (Sotomayor, J.) (plaintiff's allegations were "replete with inconsistent and contradictory statements," as he repeatedly changed his story regarding a host of constitutional claims as well as the characterization of his injuries). Significantly, each of these cases contains three material distinctions from Plaintiff's case: (1) a plaintiff whose own story was internally inconsistent and changed throughout the proceedings, *see, e.g.,* *Slacks,* 2009 WL 3164782, at *2 ("Plaintiff gives multiple versions of the events ... which are ... inconsistent and contradictory."); (2) substantial evidence undermining or directly refuting the plaintiff's version of events, *see, e.g.,* *Jeffreys,* 426 F.3d at 553 (noting that "the absence of any evidence of external injury ... ruled out the possibility that Jeffreys 'suffered a blow to the head with a hard round object such as a flashlight' " as plaintiff alleged); and (3) defendants who submitted affidavits or declarations categorically denying the plaintiff's version of events. *See, e.g.,* *Slacks,* 2009 WL 3164782, at *5-8 (discussing the defendants' version of events, as sworn to in declarations, which refuted plaintiff's fanciful allegations).

The Court is unaware of any material inconsistencies in Plaintiff's account. Admittedly, Plaintiff's evidence is minimal, and his allegations may suffer from a lack of corroboration. That said, Plaintiff's uncontroverted and sworn deposition testimony that Defendant Gonzalez physically assaulted him while Defendant Richard stood by idly-together with the January 11 aftercare instructions indicating a "deep bruise" on Plaintiff's face-is sufficient to establish an issue of material fact and defeat summary judgment. *See* *Rossi v. Stevens,* No. 04 Civ. 01836(KMK), 2008 WL 4452383, at *5 (S.D.N.Y. Sept.30, 2008) ("Though Plaintiff's evidence is minimal-it consists primarily of his own testimony-it is nevertheless sufficient to indicate the existence of a disputed material fact as to whether the force allegedly applied to him was wanton and unnecessary."); *see also* *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) ("Although [plaintiff's] evidence may be thin, his own sworn statement is adequate to counter summary

Slip Copy, 2010 WL 3398156 (S.D.N.Y.)
**(Cite as: 2010 WL 3398156 (S.D.N.Y.))**

judgment in this case and must be weighed by a trier of fact.").

**\*9** Plaintiff has consistently maintained that Defendant Gonzalez, without any provocation or justification, aggressively attacked him, while Defendant Richard watched, failed to intervene, and verbally taunted and abused Plaintiff. Remarkably, Defendants have submitted no alternative version of the events of January 2, nor have they suggested to the Court any justification for Officer Gonzalez's use of force. *Cf. Gardine v. Maxwell,* No. 08 Civ. 6524(SHS), 2010 WL 808995, at \*5 (S.D.N.Y. Mar.9, 2010) (granting summary judgment when, despite plaintiff's claims that officers used excessive force, "[t]he videotape record entirely discredit[ed] [plaintiff's] version of the facts such that no reasonable jury could believe him"). Instead, the crux of Defendants' argument is that the assault never occurred, because no "use of force" incident report exists in Sing Sing's administrative records, and Plaintiff's medical records do not reflect the precise treatment Plaintiff claims to have received.

As an initial matter, the Court places little probative value on the absence of a "use of force" incident report. If, as Plaintiff attests, Defendants removed him from the sight of other prisoners and guards before assaulting him, the Court would not expect these same officers to then write up an incident report documenting their impermissible use of force. Similarly, a reasonable jury could conclude that Defendants, in an effort to conceal their unlawful use of force, took Plaintiff to a secluded area before physically assaulting him, and then failed to document the incident.

The medical records do, however, raise some obstacles to Plaintiff's case, but not to the extent that summary judgment is warranted. Plaintiff has repeatedly alleged that he was transported to WMC on January 6 and received sutures to his right eye. This allegation is unsupported by Plaintiff's medical records. Sing Sing records do not reflect transport to an outside facility on that date (Jones Decl. Ex. A.), nor do WMC records reflect any treatment on that date. (*See* Nowve Supp. Decl. Ex. A.) Due to this deficiency, a reasonable jury might have difficulty concluding that Plaintiff received sutures on January 6. [FN11] Nevertheless, any inquiry into Plaintiff's credibility as to the *extent* of his injuries is inappropriate at this stage. *See Scott,* 344 F.3d at 289-90 ("By finding against [plaintiff] on the basis of the disparity between

some of [plaintiff's] medical records and statements in his affidavit, the district court made an impermissible credibility determination and weighed contradictory proof.").

> [FN11.] Plaintiff contends that the records relating to his January 6 treatment have been concealed or destroyed. Plaintiff claims that the treating physician on those dates-Dr. Bahski-has since been fired from Sing Sing for falsifying records. Because Plaintiff has offered no support for this speculative allegation, the Court cannot conclude at this point that a reasonable jury, without more, could accept this as true.

Ultimately, a jury may reject Plaintiff's contention that he received sutures to his right eye on January 6. But, such a determination does not necessarily require a conclusion that Defendants did not unjustifiably assault Plaintiff on January 2, or that he was not injured at all. Indeed, the aftercare instructions given to Plaintiff following a visit to WMC on January 11 indicate that Plaintiff had "a contusion (deep bruise) around the face or scalp." (Jones Decl. Ex. A.) This is consistent with the injuries complained of by Plaintiff. Defendants have offered no explanation for this notation in Plaintiff's medical file, despite having submitted this document in support of their own motion. In fact, Defendants appear to have overlooked this portion of the medical records. Therefore, it cannot be said that Plaintiff's medical records are devoid of any support for his injury. *Cf. Vatansever v. New York City,* No. 01 Civ. 11621(WHP), 2005 WL 2396904, at \*3 (S.D.N.Y. Sept.28, 2005) ("The absence of any reference to physical injury in [plaintiff's] voluminous medical [file] for five months after he claims he was brutally beaten undermines his excessive force claim."), *aff'd,* 210 F. App'x 26 (2d Cir.2006) .[FN12]

> [FN12.] In addition, Plaintiff might lend further credibility to his account by pointing to the disciplinary charges that he claims were brought against him at the behest of Defendant Gonzalez shortly after he filed his grievance about the assault. (*See* Am. Compl. Ex. 5.) On January 11, Plaintiff states that "words [were] exchanged once again between me and Officer Gonzalez." (Pl.'s Depo. at 86.) Also on this date, all of Plaintiff's property was alleged to be improperly in his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3398156 (S.D.N.Y.)
**(Cite as: 2010 WL 3398156 (S.D.N.Y.))**

possession and removed from his cell, despite the fact that Plaintiff had permits for everything he kept in his cell. (*See id.* at 24, 42-43.) The disciplinary charges brought against Plaintiff as a result of these events were ultimately deemed meritless. (*See* Am. Compl. Ex. 6.) Although Plaintiff does not assert a separate claim for these charges, they could lead to the inference that a concerned Defendant Gonzalez was attempting to discourage Plaintiff from continuing with his grievance.

**\*10** Viewing the facts in the light most favorable to Plaintiff, considering Plaintiff's sworn testimony, Defendants' failure to rebut Plaintiff's version of events, and the January 11 aftercare instructions, there are genuine issues of fact that preclude summary judgment. On this record, a jury could come to several reasonable conclusions. On the one hand, a reasonable jury could conclude that Plaintiff's injuries were not as serious as alleged (or even non-existent), thus, limiting his damages, or precluding any liability on the part of Defendants. By contrast, a reasonable jury could also conclude that the visible contusion on Plaintiff's face on January 11, nine days after the incident, underscores the severity of Plaintiff's injuries. Yet, each of these conclusions turns on Plaintiff's credibility, and the as-of-yet unheard testimony of Defendants. This case does not present the "rare circumstance where there is nothing in the record to support plaintiff's allegations, other than his own contradictory and incomplete testimony." *Slacks,* 2009 WL 3164782, at *13 (citing *Jeffreys,* 426 F.3d at 554-55). Therefore, the Court recommends that summary judgment be denied.

**2.** *Plaintiff's Injuries*
Defendants also argue, in the alternative, that Plaintiff has failed to establish that his injuries are more than *de minimis,* and, therefore, he cannot sustain his Eighth Amendment claim. (*See* Defs.' Mem. at 10-11.) Defendants' argument is misguided.

In addressing the objective prong of an excessive force claim, Plaintiff need only show that the force used-not the injury-was more than *de minimis. See* *Wright,* 554 F.3d at 269; *Walsh,* 194 F.3d at 48. The primary inquiry in an excessive force case is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to

cause harm." *Wright,* 554 F.3d at 269.

Although the absence of a serious injury may be relevant in determining whether the force used was *de miminis,* or appropriate under the circumstances, Defendants have offered no justification for their alleged use of force. Therefore, the Court cannot conclude, given the evidence presented by the parties, that Defendants did not use force "maliciously and sadistically to cause harm." Furthermore, Plaintiff alleges that Defendant Gonzalez beat him up on January 2, and the objective medical evidence from nine days later indicates Plaintiff still had a deep bruise on his face at that time. Accordingly, the Court recommends that summary judgment based on Plaintiff's purported failure to establish an injury that is more than *de minimis* be denied.

**III. Deprivation of Medical Care**
Plaintiff also alleges that Defendants denied him medical care following the incident on January 2. Defendants, however, have not moved for summary judgment on this claim. In any event, Defendants do not contend that they offered Plaintiff any medical assistance. In fact, Defendants have submitted no statements as to their personal involvement in the incident on January 2. Because this Court recommends that Plaintiff's excessive force claim survive summary judgment, and Plaintiff has made the undisputed statement that he received no medical assistance for his eye injury until January 6, at the earliest, Defendants are not entitled to summary judgment on Plaintiff's claim for deprivation of medical care.

* * * *

**\*11** In sum, Plaintiff has repeatedly and consistently alleged, since January 2, 2009, the date of the incident and when he first filed his grievance, that Defendant Gonzalez assaulted him, while Defendant Richard watched, verbally abused Plaintiff, and, most significantly, failed to intervene. Neither Defendant offered Plaintiff medical care thereafter, but instead, sent Plaintiff back to his cell where he allegedly remained imprisoned for four consecutive days. Defendants have not rebutted any of these allegations.

Plaintiff alleges he received sutures to his injured eye on January 6. Although there is no supporting evidence for that precise treatment, Plaintiff was taken to WMC on January 11, after which he was given

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3398156 (S.D.N.Y.)
**(Cite as: 2010 WL 3398156 (S.D.N.Y.))**

instructions for treating a deep contusion to his face. That same day, Plaintiff was brought up on disciplinary charges which were ultimately dismissed as unestablished in the record.

In moving for summary judgment, Defendants themselves remain strangely silent, offering nothing in the way of an explanation for their actions or an alternative version of events. Nor have Defendants put forth any evidence from Dr. Bahski-who Plaintiff alleges treated him for his eye injury on January 6 and 11. And, despite the fact that Plaintiff was examined by Nurse Conklin on January 6, albeit for an apparently unrelated reason, Nurse Conklin makes no mention of her treatment or observations of Plaintiff on January 6 in her affidavit, discussing only her visits with Plaintiff in September 2009. On this record, Defendants simply have not met their burden of showing that no material issue of fact exists for trial.

## CONCLUSION

For the foregoing reasons, the Court recommends that Defendants' motion for summary judgment be denied.

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this report to file written objections. *See also* Fed.R.Civ.P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Paul A. Crotty, United States District Judge, 500 Pearl Street, New York, N.Y. 10007, and to the chambers of the undersigned, Room 1660, 500 Pearl Street. Any requests for an extension of time for filing objections must be directed to Judge Crotty. Failure to file objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 147-48, 106 S.Ct. 466, 471, 88 L.Ed.2d 435 (1985); *Mario v. P & C Food Mkts., Inc.,* 313 F.3d 758, 766 (2d Cir.2002); *Spence v. Superintendent,* 219 F.3d 162, 174 (2d Cir.2000); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam).

S.D.N.Y.,2010.
Butler v. Gonzalez
Slip Copy, 2010 WL 3398156 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.